**STATE of Tennessee**

v.

**Ungandua Andre INGRAM.**

Supreme Court of Tennessee,
at Nashville.

Oct. 7, 2010 Session Heard
at Centerville.[1]

Jan. 21, 2011.

---

1. Oral argument was heard in this case on October 7, 2010, in Centerville, Hickman County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Senior Counsel, Nashville, Tennessee; Charles Crawford, District Attorney General; Weakley E. Barnard, Assistant District Attorney General; William Bottoms, Assistant District Attorney General, for the appellant, State of Tennessee.

Raymond W. Fraley, Jr., Fayetteville, Tennessee, for the appellee, Ungandua Andre Ingram.

## OPINION

SHARON G. LEE, J., delivered the opinion of the Court, in which CORNELIA A. CLARK, C.J., JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Police officers had probable cause to arrest the defendant on drug charges based on information from a confidential informant and their surveillance of an illegal drug transaction. Shortly thereafter, when they observed the defendant commit a minor traffic offense, they pulled in behind him at a gasoline station and turned on their blue lights. The officers searched the defendant and told him that they had grounds to arrest him for drug distribution if they "wanted to." The search of his person produced cash from the drug transaction. The police then searched the defendant's residence based on his consent, although the defendant disputed that he consented to the search. The search produced, among other things, cocaine and marijuana. The defendant was advised of his *Miranda* rights, but was not taken into custody. About four months later, the defendant was indicted on ten counts of drug-related charges. The defendant moved to suppress the fruits of the search of his person and his residence. After the trial court denied the motion to suppress, the defendant was convicted of selling cocaine, conspiring to sell cocaine, possession of cocaine with intent to sell, possession of marijuana and possession of unlawful drug paraphernalia. On review, we hold that the defendant was not under arrest at the time of the search of his person, and therefore the warrantless search was invalid. The warrantless search of his residence, however, was proper because the defendant consented to the search and the consent was not the product of the previous illegal search of the defendant's person. The defendant's convictions are reversed in part and affirmed in part.

## Factual and Procedural Background

This case arose from two controlled purchases of crack cocaine made by a confidential informant ("CI") employed by the Seventeenth Judicial District Drug Task Force. The officers involved in the operation were Director Tim Lane, Assistant Director Tim Miller, Special Agent Shane George of the Shelbyville Police Department, and Deputy Billy Ostermann of the Marshall County Sheriff's Department. These officers, as well as the CI and Ungandua Ingram ("the Defendant") testified at a suppression hearing held on February 1 and March 13 of 2008. From their testimony, we gleaned the following facts.

On April 13, 2007, the officers arranged for the CI to make a controlled crack cocaine buy from Tonya Hampton, the codefendant in this case and the target of the Drug Task Force's operation.[2] After the CI called Ms. Hampton and arranged to purchase from her an "eight-ball"[3] of crack cocaine, he met with Agent George and Deputy Ostermann. Deputy Ostermann outfitted the CI with a "wire" transmitter for the purpose of transmitting and recording any conversation during the buy. Agent George searched the CI for money, weapons, and contraband, and, finding none, issued him $150 in cash with recorded serial numbers for the cocaine purchase.

Agent George drove the CI to a location about a half mile from Ms. Hampton's house and dropped him off there. While the CI walked to Ms. Hampton's residence, Agent George parked at a nearby location with a view of the house and driveway. Assistant Director Miller had already set up surveillance from a location behind Ms. Hampton's house with a view of the rear entrance. Deputy Ostermann drove to a nearby parallel street, monitored the transmission from the CI's wire, and operated the equipment to record the transmission. Deputy Ostermann was the only agent who was able to hear the CI's conversations in "real time," but he was not parked in a position where he could see the house. Director Lane was driving the perimeter of the operation in a supervisory capacity. The officers updated one another on the surveillance proceedings via radio.

The CI entered Ms. Hampton's house, and she took him to a room separate from the other people in the house and closed the door. The CI told Ms. Hampton he wanted to buy an eight-ball, and she said, "I've got to call and have it delivered." Ms. Hampton called someone on her cell phone and told the person to bring the "dope" to her house. After the call, Ms. Hampton said, "you'll be surprised who I'm calling." The CI asked who it was, and Ms. Hampton responded that it was his nephew "Ungandua." The Defendant is the CI's nephew. After they heard a car pull up, Ms. Hampton left the room.

During this time, Agent George and Assistant Director Miller saw a white "roundbody" style Chevrolet Caprice drive into Ms. Hampton's driveway. They saw a black male wearing dark pants and a grey hooded sweatshirt get out of the Caprice and enter the house. Shortly thereafter, Ms. Hampton returned to the room and gave the CI a small bag of what appeared to be crack cocaine in return for $150 in cash. As the CI was leaving the house, he saw the Defendant. Because they were not on good terms due to a previous dis-

---

2. Ms. Hampton's case and the Defendant's case were severed for trial. Only the Defendant's charges and convictions are involved in the appeal.

3. The officers testified that an "eight-ball" is one-eighth of an ounce, or 3.5 grams.

agreement, they did not speak. The CI testified that outside the house he saw the Defendant's car, "one of those round-bodied white Caprices." The CI made his way back to Agent George's vehicle and gave him the crack cocaine.

The white round-body Caprice left Ms. Hampton's house shortly thereafter. Agent George, believing the Caprice's driver to be Ms. Hampton's drug supplier, radioed Deputy Ostermann with a description of the vehicle and instructed him to search the area for it. As Deputy Ostermann passed nearby Saint Ann Street, he saw a car matching the description of the Caprice parked in a residential driveway and saw a male matching the Defendant's description walking away from the car. Meanwhile, the CI told Agent George that the Defendant was the person who had delivered the crack cocaine and that the Defendant was going back to his residence on Saint Ann Street. Director Lane, having heard this information over the radio, searched the Department of Motor Vehicles' database and discovered that a vehicle matching the Caprice's description was registered to the Defendant and that the Defendant's driver's license listed an address on Saint Ann Street.

About forty-five minutes to an hour after the first buy, the officers decided to send the CI back to Ms. Hampton's house for a second controlled buy of another eight-ball. They followed a procedure similar to the first arranged buy, searching the CI, wiring him with a transmitter, providing him with $150 in recorded bills, and sending him on foot to the house. After the CI entered Ms. Hampton's house this time, Ms. Hampton told him that she had already sent her sister to deliver the crack cocaine to the CI's house. Ms. Hampton called her sister and asked her to return with the eight-ball, which she did. The CI then gave her the $150 in

exchange for the small sack of what appeared to him to be crack cocaine. On this occasion, the CI did not see or hear the Defendant at the residence, nor did the surveillance officers see the white round-body Caprice at the house around the time of the purchase. The CI again met up with Agent George, gave him the bag of crack cocaine, and was released.

Assistant Director Miller radioed Agent George, told him he had located the Caprice parked nearby in the area, and instructed him to prepare to follow it. Assistant Director Miller then observed three persons come out of the nearby residence and get in the Caprice. Agent George recognized the white Caprice as the same car he had observed at the Hampton residence during the first controlled buy. He followed the Caprice when it drove off and observed the car fail to come to a complete stop at two stop signs. Agent George radioed this information to Director Lane and Assistant Director Miller, each of whom was driving his vehicle in the area. The Caprice pulled into the parking lot of a Shell gas station. Assistant Director Miller activated his blue lights and pulled in behind it. Director Lane did the same almost immediately thereafter. Assistant Director Miller approached the Defendant first and told him they were stopping him because of his stop sign violations. The officers saw two young children in the back seat of the vehicle. Director Lane then told the Defendant that they had been conducting a drug investigation and asked him to get out and step to the rear of the car so that they could discuss the investigation away from the children. The Defendant complied with this request.

Shortly after the officers initiated the stop, the CI and his brother arrived at the Shell station and asked permission to take care of the Defendant's children. Director Lane testified that he responded that "we

are still in the middle of conducting an investigation, and we'd be making a decision regarding the issue involving the children and ... basically don't bother us right now." The CI and his brother then drove away.

Once the Defendant got to the back of the car outside of the children's earshot, Director Lane told him that "we had made a controlled purchase of crack cocaine earlier in the evening and that I felt that there was enough probable cause that if we wanted to ... we would arrest him for distribution of cocaine base, conspiracy to distribute cocaine base." Director Lane then searched the Defendant's person without his consent. Director Lane discovered $621 in cash on the Defendant, including four of the twenty-dollar bills provided by Agent George to the CI to make the first controlled buy, but found no drugs. Assistant Director Miller then searched the Defendant's car, with his consent, and found nothing incriminating.

Director Lane testified that he told the Defendant that he had "recovered buy money from him" and asked him if he would consent to a search of his residence. Director Lane told the Defendant that "I felt we had enough probable cause to prepare a search warrant and for me to go before a judge and have the judge look at the search warrant, determine whether or not the judge also agreed that we had enough probable cause." Director Lane further explained to the Defendant that "if he [the Defendant] wanted to he could consent to a search of his residence and I told him that this had to be something that he wanted to do on a voluntary basis, that if he did not have the desire to do it on a voluntary basis, then he was not required to do it."

By this time, the CI and his brother had returned to the Shell station. Director Lane testified that the Defendant began to bargain with him regarding giving his consent, stating as follows:

[The Defendant] told me that he wanted to know from me if he consented to a search of his residence or was going to agree to cooperate with us ..., would there be any way that the children could be turned over to one of the two relatives that by now had showed up at that location, and I told him that wouldn't be any problem. I would be more than glad to release the children to one of the relatives.

Then [the Defendant] asked about his car, and I told him that in regards to the car, I said that it had been used in a drug crime, and that it was subject to forfeiture and seizure, but I told him that if he had a desire to cooperate that I would most likely also release the car from the scene and let one of his relatives take possession of the car. He indicated that he was willing to cooperate, was willing to consent to a search of his residence, and that he would accompany us to his residence.

Following the Defendant's consent to search his residence, the officers, at the Defendant's request, allowed the children to go with the CI and his brother. Assistant Director Miller placed the Defendant in the back of his patrol car. Director Lane radioed Agent George and Deputy Ostermann and directed them to go to the Defendant's house and secure the outside. Upon arrival at his house, the Defendant unlocked the door and let the officers inside. He took them to one of the rooms and produced a small bag of crack cocaine. The officers searched the rest of the residence and found a bulletproof vest and a .45 caliber pistol in a closet, a larger bag of powder cocaine, a set of digital scales covered in apparent cocaine residue, a small bag of marijuana, and $2,000 in cash. Later lab test results indicated that the bags

contained 14.6 grams of powder cocaine, 3.3 grams of crack cocaine, and 3.5 grams of marijuana.

Following the search, Director Lane advised the Defendant of his *Miranda* rights. The Defendant waived his right to remain silent and to have an attorney present. The Defendant and Director Lane discussed the possibility of the Defendant doing confidential informant work in targeting his cocaine supplier. The Defendant said he needed time to think about it. Director Lane gave the Defendant his contact information and told him that if the Defendant did not contact him, "we would take the appropriate action." The agents did not take the Defendant into custody following the search of his residence. They gave the Defendant a "verbal warning" for the stop sign violations and issued no citations. The officers returned the Defendant's car keys, and he walked back to the Shell station to get his car.

The Defendant testified at the suppression hearing, but not at trial. He stated that he did not deny rolling through the stop signs and admitted that he probably did. He denied giving consent to search his car and stated that he could not remember giving consent to search his house. The Defendant further stated that the officers told him "they are going to send my kids to human resources unless I consent to do what they want me to do." He testified that once his uncles (the CI and his brother) returned to the Shell station, Director Lane told him that his relatives could take the children if he consented to the search. The Defendant stated that he was not made aware that he could refuse consent to search and that the officers never informed him of his *Miranda* rights. Director Lane denied that the officers threatened to take the Defendant's children or to send them to the Department of Human Services or Children's Services.

The Defendant did not follow up with Director Lane about the possibility of doing informant work. On August 22, 2007, roughly four months later, the Marshall County Grand Jury returned a ten-count indictment against the Defendant charging him with two counts of selling .5 grams or more of cocaine; two counts of delivery of .5 grams or more of cocaine; two counts of conspiring to sell .5 grams or more of cocaine; one count of possession of .5 grams or more of cocaine with intent to sell; and one count of possession of .5 grams or more of cocaine with intent to deliver, each a Class B felony. *See* Tenn. Code Ann. § 39–17–417(b) (2006). The Defendant was also charged with one count of simple possession of marijuana and one count of possession of unlawful drug paraphernalia, each a Class A misdemeanor. *See* Tenn.Code Ann. §§ 39–17–418(c), –425(c)(2) (2006).

The Defendant moved to suppress the evidence discovered as a result of the warrantless searches of his person and his residence. Following the suppression hearing on February 1 and March 13, 2008, the trial court entered an order denying the motion to suppress. The trial court found that the search of the Defendant's person was valid because it was conducted incident to a lawful arrest and that the Defendant had given valid and voluntary consent to search his residence.

The case was tried before a jury on September 24–25, 2008. Director Lane, Assistant Director Miller, Agent George, Deputy Ostermann, and the CI testified at trial, largely repeating their earlier testimony at the suppression hearing. At the close of the State's proof, the trial court granted the Defendant's motion for a judgment of acquittal on the three counts alleging that the Defendant sold, delivered,

and/or conspired to sell .5 grams or more of cocaine during the second controlled drug buy at Ms. Hampton's residence because the State produced insufficient evidence to prove the charges stemming from the CI's second purchase from Ms. Hampton. The jury returned a guilty verdict, and the Defendant was convicted of one count of selling .5 grams or more of cocaine; one count of conspiring to sell .5 grams or more of cocaine; one count of possession of .5 grams or more of cocaine with intent to sell; one count of simple possession of marijuana; and one count of possession of unlawful drug paraphernalia.[4] The trial court sentenced the Defendant to an effective sentence of eight years and six months, one year of which it ordered to be served in the Marshall County Jail, with the remainder to be served on probation.

The Defendant appealed. The Court of Criminal Appeals concluded that the trial court erred in denying the Defendant's motion to suppress the fruits of the search of his person at the Shell station, because the search was not made incident to arrest in that the Defendant was not under arrest at the time of the search. *State v. Ingram*, No. M2008–02765–CCA–R3–CD, 2009 WL 3400694, at *9 (Tenn.Crim.App. Oct. 21, 2009). The Court of Criminal Appeals held that the trial court did not err in holding that the Defendant voluntarily gave consent to search his residence. *Id.* at *10. Both parties filed an application for permission to appeal to this Court, which we granted.

We address the following issues:

(1) Whether the warrantless search of the Defendant's person was a valid search incident to a lawful arrest.

(2) Whether the warrantless search of the Defendant's residence was a valid search based on the Defendant's voluntary consent and was not the product of the illegal previous search of his person.

## Analysis

■ The police searched the Defendant's person and residence without a warrant. Our analysis begins, therefore, with the fundamental principle under our state and federal constitutions that a warrantless search is presumed invalid and any evidence discovered as a result is subject to suppression. *State v. Day*, 263 S.W.3d 891, 901 (Tenn.2008); *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn.2007). The Fourth Amendment to the Constitution of the United States, applicable to the states as recognized in *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, Article I, section 7 of the Tennessee Constitution provides:

> [T]he people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose

---

4. The trial court ruled that Count 2 of the indictment, charging delivery of cocaine, was an alternate theory of prosecution to Count 1, charging sale of cocaine, so the court merged counts 1 and 2. The trial court similarly merged Counts 7 and 8 (possession with intent to deliver cocaine and possession with intent to sell cocaine).

offenses are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

■ There are, however, recognized exceptions to the warrant rule, and the warrantless searches of the Defendant's person and house may be valid if the searches fall within one of the exceptions. Recognized exceptions to the rule include a search incident to a lawful arrest and a search to which a suspect has voluntarily consented.[5] *Day,* 263 S.W.3d at 901 n. 9.

■ These exceptions, however, must remain "well-delineated," "jealously and carefully drawn," *id.* at 901 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)); *Rippy v. State,* 550 S.W.2d 636, 641 (Tenn. 1977), and "narrowly" defined. *State v. Nicholson,* 188 S.W.3d 649, 656 (Tenn. 2006); *State v. Randolph,* 74 S.W.3d 330, 334 (Tenn.2002); *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997).

■ As we review the trial court's decision, we are mindful that the "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom,* 928 S.W.2d 18, 23 (Tenn.1996). When the trial court has seen and heard the witnesses testify, we must afford considerable deference to the factual determinations made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.,* 277 S.W.3d 896, 898 (Tenn.2009). Although "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that

evidence," *Odom,* 928 S.W.2d at 23, the burden remains on the State to prove that a warrantless search was constitutionally permissible. *Nicholson,* 188 S.W.3d at 656–57; *State v. Henning,* 975 S.W.2d 290, 298 (Tenn.1998). We review the trial court's application of law to the facts de novo without a presumption of correctness. *Day,* 263 S.W.3d at 900; *State v. Daniel,* 12 S.W.3d 420, 423 (Tenn.2000).

### Search of the Defendant's Person

■ One of the exceptions to the warrant requirement provides that a law enforcement officer may, incident to a lawful arrest, search the person arrested and the immediate surrounding area. *See Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *State v. Crutcher,* 989 S.W.2d 295, 300 (Tenn.1999). A search incident to a lawful arrest is justified by the need to protect the arresting officer and others from harm and the need to prevent the concealment or destruction of evidence. *See Knowles v. Iowa,* 525 U.S. 113, 116, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998); *Crutcher,* 989 S.W.2d at 300.

The validity of the search of the Defendant's person in the parking lot at the Shell station after visual and audio surveillance by police of his role in the drug transaction depends on whether the search was incident to his arrest. For a search to be valid as a search incident to a lawful arrest, there must first be a lawful arrest made contemporaneously with the search. In this case, the critical question is: was the Defendant under arrest at the time of the search of his person?

■ In answering this question, we review the three distinct levels of interac-

---

**5.** The other exceptions include searches yielding contraband in "plain view," searches conducted in "hot pursuit" of a fleeing criminal, searches limited to a "stop and frisk" based on reasonable suspicion of criminal activity, and searches supported by probable cause in the presence of exigent circumstances. *Day,* 263 S.W.3d at 901 n. 9.

tion between citizens and law enforcement officials. The first and most limited interaction is the brief police-citizen encounter, which requires no objective justification and is limited to informal questioning of the person involved. *Day*, 263 S.W.3d at 901. The next level is the brief investigatory detention, which must be supported by reasonable suspicion of wrong-doing and entitles the officer to conduct a stop and frisk under the principles of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *Day*, 263 S.W.3d at 901. The third and most invasive level is the full-scale arrest, which must be supported by probable cause. *Id.; accord Crutcher*, 989 S.W.2d at 300.

The investigating officers saw the Defendant commit two traffic violations, and therefore they were justified in making an initial investigatory detention. *See State v. Brown*, 294 S.W.3d 553, 562 (Tenn.2009) (noting that "[w]hen the police have probable cause to believe that a traffic violation has occurred, the temporary detention of an individual during the stop of the vehicle is considered constitutionally reasonable, irrespective of the subjective motivations of the officer making the stop."). At the time the officers activated their emergency blue lights and pulled in behind the Defendant's vehicle at the Shell station, he was seized. *See Day*, 263 S.W.3d at 902 ("The law is settled that an automobile stop by the use of flashing blue lights constitutes a 'seizure.'"); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn.2000).

This investigative stop entitled the officers to conduct a limited patdown search for weapons pursuant to *Terry*, 392 U.S. 1, 88 S.Ct. 1868, and its progeny. The search of the Defendant, however, went further than a *Terry* patdown, and he was subjected to a full search. Therefore, the State was required to demonstrate that (1) the officers had probable cause to believe

that the Defendant had committed an offense for which a full custodial arrest was permitted, *State v. Richards*, 286 S.W.3d 873, 878 (Tenn.2009), and (2) that the Defendant was under arrest at the time of the search. *Crutcher*, 989 S.W.2d at 301 (stating "[i]n order to justify a full *Chimel* search incident to arrest, the critical question remains whether the [defendant] was, in fact, arrested at the scene.").

■■■ Based on their surveillance of the drug deal and the information they received from the CI, the officers had probable cause to believe that the Defendant has committed a drug offense for which he could be arrested. The next question, and the more difficult question in this case, is whether the Defendant was under arrest at the time of the search. Whether an arrest has occurred is not always clear; it is a fact-intensive inquiry. *See id.* at 299. The ultimate conclusion of whether the facts establish that a person was under custodial arrest is one of law. *See Daniel*, 12 S.W.3d at 423–24 (stating "the trial court's conclusion that a seizure did not occur is a conclusion of law derived from an application of the law to the undisputed facts of this case"); *State v. Nidiffer*, 173 S.W.3d 62, 64 (Tenn.Crim.App. 2004) (reviewing issue of whether defendant was under arrest when he refused to consent to a blood alcohol test under de novo standard); *State v. McCrary*, 45 S.W.3d 36, 43 (Tenn.Crim.App.2000) (stating that "[i]n contrast to the determination of when a seizure has occurred, the determination of whether a consent to a search was voluntarily given is a question of fact"); *see also United States v. Hernandez*, 825 F.2d 846, 851 (5th Cir.1987) ("It is perhaps most useful to say that the arrest determination, like the probable cause determination, presents a question of law greatly dependent upon factual findings."); Wayne A. Logan, *An Exception Swallows*

*a Rule: Police Authority to Search Incident to Arrest,* 19 Yale L. & Pol'y Rev. 381, 426 (2001) ("Despite the occasional reference to the arrest question as being factual in nature, it is more properly conceived as a legal (indeed, constitutional) question that must be resolved on the basis of factual determinations made by the court.") (footnote omitted).

 In Tennessee, the definition of "arrest" is well-established; it is " 'the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest.' " *Crutcher,* 989 S.W.2d at 301 (quoting *West v. State,* 221 Tenn. 178, 425 S.W.2d 602, 605 (1968)). Although "[a]n arrest may be affected without formal words or a station house booking ... there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." *Id.* at 301–02 (citing 5 Am.Jur.2d *Arrest* § 2 (1995)).

Our previous analysis in *Crutcher* of whether an arrest had occurred is instructive. In *Crutcher,* police officers apprehended the defendant after he wrecked his motorcycle following a high-speed chase. *Id.* at 298. The officer placed the defendant's arm behind his back and intended to arrest him, but did not handcuff the defendant when he complained of injuries from the crash. *Id.* While waiting for an ambulance, the officers told the defendant he would be taken to a hospital but did not mention criminal charges or arrest proceedings, nor did they advise him of his *Miranda* rights. *Id.* Before releasing the motorcycle to a friend of the defendant, one of the officers searched the defendant's backpack and found a handgun and packets of cocaine. Following the defen-

dant's release from the hospital, he was taken to the Drug Task Force Center, but returned the following day to the hospital where he stayed for four days. *Id.* at 298–99. Upon his release, the defendant was arrested and charged with possession of the handgun during the commission of a felony and possession of cocaine, among other things. *Id.* at 299.

At issue was the warrantless search of the defendant's backpack. We held that the search could not be justified as a search incident to a lawful arrest, because the defendant was not under arrest at the time of the search. *Id.* at 302. Significant factors supporting this conclusion included the facts that the apprehending officer did not discuss criminal charges or arrest procedures with the defendant, that it was clear that the officer "did not believe he had arrested the [defendant]," *id.* at 302 n. 11, that the officers "did not take the [defendant] into custody until several hours later when he was first released from the medical center," *id.* at 302, and that the defendant was not formally arrested until approximately four days later. *Id.* at 302 n. 12. The *Crutcher* Court concluded:

> If law enforcement officers intend to justify a search as incident to an arrest, it is incumbent upon them to take some action that would indicate to a reasonable person that he or she is under arrest. Although formal words of arrest are not required, some words or actions should be used that make it clear to the arrestee that he or she is under the control and legal authority of the arresting officer, and not free to leave.

*Id.* at 302 (footnote and internal citation omitted).

 Applying the *Crutcher* analysis to the facts in the present case, we conclude that the facts presented here more strongly support the conclusion that the Defen-

dant was not under arrest during the search of his person than did the factual scenario in *Crutcher*. In this case, the police officers did not lay hands on the Defendant before the search. They asked the Defendant to step out of the car and move to the rear, but testified that this request was made for the purpose of talking with him outside of his children's presence. *See Brown*, 294 S.W.3d at 562 (observing that "ordering a driver to get out of a vehicle and stand alongside it . . . can only be described as a 'de minimus' intrusion or a 'mere inconvenience.'" (quoting *Berrios*, 235 S.W.3d at 107)). Very shortly after the stop, Director Lane informed the Defendant that he was going to search him because "we had been conducting a drug investigation earlier in the evening and that in my opinion, that we had enough probable cause to affect [sic] an arrest of him *if we wanted to* in regard to conspiracy to distribute cocaine base and distribution of cocaine base." Director Lane's testimony was candid, clear, and unequivocal that he believed he *could have* arrested the Defendant based on probable cause, but that he did not indicate to the Defendant that he was under arrest, did not intend to arrest him, and did not consider him under arrest. Assistant Director Miller similarly testified that he believed that after the initial stop, "if he [the Defendant] wanted to leave he could have left." Assistant Director Miller also stated that "based upon everything we saw and the evidence we had that night he could have been arrested."

It is not sufficient that an arrest *could* have been made; the arrest *must* have been made roughly contemporaneously to the search in order for it to justify the search as incident to an arrest. In *Crutcher*, we "decline[d] to hold that a search may be upheld as a search incident to arrest merely because a lawful custodial arrest 'could have' been made," 989 S.W.2d

at 301 n. 8, and emphasized that "we are not prepared to hold that the police may conduct a warrantless search merely because they have probable cause to arrest the suspect." *Id.* at 302; *see also Knowles*, 525 U.S. at 115–16, 119 S.Ct. 484 (rejecting Iowa Supreme Court's "reasoning that so long as the arresting officer had probable cause to make a custodial arrest, there need not in fact have been a custodial arrest"); *Belote v. State*, 411 Md. 104, 981 A.2d 1247, 1257 n. 7 (2009) (rejecting state's position "that law enforcement, in order to effect a custodial arrest, only needs probable cause and detention of the suspect"); *People v. Evans*, 43 N.Y.2d 160, 400 N.Y.S.2d 810, 371 N.E.2d 528, 531 (1977) (concluding that "[t]o adopt the proposition that the search was valid because there was probable cause to arrest puts the cart before the horse. An arrest is an essential requisite to a search incident").

In *Crutcher*, the apprehending officer intended to place the defendant under arrest, but stopped because of the defendant's injuries. In this case, the officers never intended to place the Defendant under arrest nor did they inform the Defendant he was under arrest. *See Nidiffer*, 173 S.W.3d at 66 (observing that "while not dispositive, an officer's telling a defendant he is under arrest is a substantive factor to consider when determining whether an arrest has occurred."). As in *Crutcher*, the officers did not believe they had arrested the Defendant. When Deputy Ostermann was asked at trial if they arrested the Defendant, he replied, "absolutely not. He was left at his residence when we left." While the officers' subjective intentions clearly are not dispositive on the issue of whether a suspect is under arrest, *cf. Whren v. United States*, 517 U.S. 806, 815, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), *Crutcher* demonstrates that the

officers' subjective intentions are not irrelevant *in the context of* determining whether the State may justify a warrantless search on grounds that it was made incident to a valid custodial arrest.

Finally, in *Crutcher*, we noted that the apprehending officers did not take the defendant into custody until several hours after the search, and that "the formal arrest was not made until approximately four days later." 989 S.W.2d at 302 n. 12. In the present case, the police officers did not take the Defendant into custody until his indictment more than four months after the searches.[6]

■ In summary, we agree with the Court of Criminal Appeals' conclusion that the officers did not take such action "that would indicate to a reasonable person that he or she is under arrest" as required by *Crutcher*. *Id.* at 302. Accordingly, we conclude that the trial court erred in denying the Defendant's motion to suppress the fruits of the warrantless search of his person—the four $20 bills used by the CI to make the first controlled drug buy from Ms. Hampton. We also agree with the intermediate appellate court's conclusion that although the State provided other evidence connecting the Defendant to the first controlled buy at Ms. Hampton's house, the Defendant's "possession of these twenty-dollar bills was particularly damning." *Ingram*, 2009 WL 3400694, at *9. Accordingly, we are not persuaded beyond a reasonable doubt that the admission of this evidence did not contribute to the jury's decision-making in finding the Defendant guilty of the sale of .5 grams or more of cocaine and conspiracy to sell .5 grams or more of cocaine to the CI. *See State v. Brown*, 311 S.W.3d 422, 434 (Tenn. 2010); *State v. Rodriguez*, 254 S.W.3d 361,

371–72 (Tenn.2008). Accordingly, the erroneous admission of this evidence was not harmless. *See* Tenn. R.App. P. 36(b). The Defendant's convictions for the sale of .5 grams or more of cocaine and conspiracy to sell .5 grams or more of cocaine are reversed, and the case is remanded for a new trial on those charges.

■ We concur, however, with the Court of Criminal Appeals' conclusion that the admission of this evidence was harmless as to the Defendant's other convictions—those related to the drugs and drug paraphernalia found in his home. As a non-structural constitutional error, the erroneous admission of this evidence is only harmless when it appears beyond a reasonable doubt that its admission did not contribute to the verdict obtained. *Brown*, 311 S.W.3d at 434; *Rodriguez*, 254 S.W.3d at 371. While the erroneously admitted evidence does raise potential dangers of prejudice, under the facts of the present case, we conclude that it appears beyond a reasonable doubt that the admission of this evidence did not have a substantial and injurious effect on the jury's decision-making with regard to the charges stemming from the discovery of drugs and drug paraphernalia in the Defendant's home. *See Rodriguez*, 254 S.W.3d at 372. Not only is the evidence of guilt overwhelming but the evidence erroneously admitted was mirrored by other admissible testimony. We conclude that it appears beyond a reasonable doubt that the erroneously admitted evidence did not contribute to the convictions stemming from the discovery of drugs and drug paraphernalia in the Defendant's home.

### Search of the Defendant's Residence

The validity of the search of the Defendant's residence depends on whether the

---

6. We do not have before us in this case a situation where the police arrested the Defendant at the scene, conducted a search incident to that arrest, and then subsequently released the Defendant.

Defendant consented to the search and if so, whether that consent was the product of the previous invalid search of his person.

## Consent

■■■■ Another exception to the warrant requirement is that a law enforcement officer may search a person's residence without a warrant if the officer obtains the person's consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The consent, to be valid, must be "unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *Berrios*, 235 S.W.3d at 109 (quoting *State v. Simpson*, 968 S.W.2d 776, 784 (Tenn.1998) (internal quotation marks omitted)). "Whether an individual voluntarily consents to a search is a question of fact to be determined from the totality of the circumstances." *Id.; accord Brown*, 294 S.W.3d at 563. After a review of the record, we conclude that the evidence does not preponderate against the trial court's finding that the Defendant voluntarily and validly consented to the search of his residence.

■■■■ The trial court saw and heard the witnesses and specifically accredited Director Lane's testimony that he advised the Defendant that he was not required to give his consent and that he was free to decline, in which case the officers would seek a judicial search warrant, and that the Defendant subsequently consented to the search. The trial court also accredited the officers' testimony that none of them threatened the Defendant with the possibility that they would take away his children or his car if he refused to consent.

We defer to these credibility-dependent findings by the trial court and conclude the evidence does not preponderate against them.

## Fruit of the Poisonous Tree

■■■■ The Defendant further argues that the evidence recovered at his residence should be excluded because it was the fruit of the illegal search of his person at the Shell station. We have observed that "a consent to search that is preceded by an illegal seizure is not 'fruit of the poisonous tree' if the consent is both: 1) voluntary, and 2) not an exploitation of the prior illegality." *Berrios*, 235 S.W.3d at 109 (quoting *State v. Garcia*, 123 S.W.3d 335, 346 (Tenn.2003) (internal quotation marks omitted)). "Under the 'fruit of the poisonous tree' analysis, the focus is on whether the evidence was obtained by exploitation of the Fourth Amendment illegality." *State v. Huddleston*, 924 S.W.2d 666, 674 (Tenn.1996) (citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Because we have determined that the trial court did not err in holding that the Defendant voluntarily gave his consent to search his house, our inquiry is whether his consent was the result of an exploitation of the prior unlawful search. In determining whether the causal connection between unlawful police action and a subsequent consent has been broken, or "whether the primary taint of an unlawful [search or] seizure has been sufficiently attenuated from the voluntary consent," we look to the factors articulated in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). *Garcia*, 123 S.W.3d at 346.[7] The

---

7. The Court of Criminal Appeals declined to apply this attenuation analysis, stating, "[w]e note that this attenuation test, by its language in *Garcia*, applies only to consensual searches that are preceded by an unlawful seizure.

The consensual search in this case, however, was preceded by a lawful seizure followed by an unlawful search." *Ingram*, 2009 WL 3400694, at *10. This conclusion was erroneous, because the attenuation test articulated

State has the burden of proving sufficient attenuation from the voluntary consent. *Id.*

The *Brown* factors are as follows: 1) the temporal proximity of the illegal seizure (or, as in this case, illegal search) and consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct. 422 U.S. at 603–04, 95 S.Ct. 2254. The first factor, the temporal proximity of the Fourth Amendment violation and the consent, weighs in favor of a finding of no attenuation, because the time between the search of the Defendant at the Shell station and the Defendant's consent to search his residence was fairly short, probably not more than ten or fifteen minutes. We noted in *Garcia* that "a brief time lapse between a Fourth Amendment violation and consent often indicates exploitation of the prior illegal police action because the effects of the misconduct have not had time to dissipate." 123 S.W.3d at 346 (quoting *State v. Hansen,* 63 P.3d 650, 666 (Utah 2002) (internal quotation marks and brackets omitted)).

Regarding the second factor, the presence of intervening circumstances, the State argues that the bargaining and negotiation initiated by the Defendant regarding whether and under what conditions he would consent constitutes an intervening circumstance. We have previously observed that attenuation issues are highly fact-specific and fact-intensive. *See Garcia,* 123 S.W.3d at 346. Under the particular facts of this case, we agree that the Defendant's attempt to bargain could be considered an intervening circumstance.

Regarding that attempt, Director Lane testified at the suppression hearing that after the search of the Defendant's person,

> This was something he was bargaining for, and he was asking me, "If I cooperate and I consent to allowing you all to search my residence, are you willing to release the children and allow—my vehicle? Are you willing to let someone else take my vehicle?"

Q: What did you tell him?

A: I told him yeah.

Q: Did you ever tell him you wouldn't release the children or would do something else with the children—

A: No, I did not.

Q: —if he didn't consent to the search?

A: No, I did not.

Q: Who brought up the conversation about releasing the children vis-a-vis the consent to search?

A: He did.

Director Lane testified that after the search of the Defendant's person, he reiterated to the Defendant that "he had an absolute right to refuse any consent to search and explained to him the process I would have to go through. I didn't know if a judge or magistrate would agree with me that I did, in fact, have enough probable cause to search his residence." The trial court specifically accredited Director Lane's testimony that he did not threaten the Defendant in order to get consent, nor did he begin the discussion about releasing his children and his vehicle to the Defendant's relatives that were on the scene. The Defendant's initiation of a bargaining

in *Brown, Garcia,* and *Berrios* is equally applicable to a consensual search preceded by an unlawful search irrespective of whether the initial seizure was permissible. *See Brown,* 422 U.S. at 597, 95 S.Ct. 2254 (stating that "[i]n *Wong Sun,* the Court pronounced the principles to be applied where the issue is whether statements and other evidence obtained after an illegal arrest *or search* should be excluded." (emphasis added)); *Huddleston,* 924 S.W.2d at 674 (noting that "the exclusionary rule was designed to protect Fourth Amendment guarantees by deterring lawless searches, seizures, and arrests.").

or negotiation conversation regarding his consent, and Director Lane's reiteration to the Defendant that his consent had to be voluntary and that he had an absolute right to refuse consent, constituted an intervening circumstance in this case that weighs somewhat in favor of a finding of attenuation.

Regarding the third factor, the purpose and flagrancy of the official misconduct, we have observed that it is considered "particularly important because it is most closely tied to the rationale of the exclusionary rule—to discourage police misconduct." *Garcia*, 123 S.W.3d at 347; *accord Huddleston*, 924 S.W.2d at 676; *see also Brown*, 422 U.S. at 604–05, 95 S.Ct. 2254. Giving due deference to the trial court's findings of fact, we find that the officers' misconduct in conducting the unlawful search was relatively minimal under the circumstances of this case. As we have noted, the initial stop and seizure of the Defendant was constitutionally valid, because the officers had probable cause to believe he had committed several traffic infractions. The officers further testified that they believed they had sufficient probable cause to arrest the Defendant at the Shell station for his involvement in the first controlled drug buy, and the trial court found that they did have probable cause. "Although [an officer's] subjective belief that he [or she] did not have enough evidence to obtain a warrant is irrelevant to whether or not probable cause actually existed, [the officer's] belief is relevant to determine the flagrancy of the Fourth Amendment violation." *Huddleston*, 924 S.W.2d at 676 (internal citation omitted).

The general principle enunciated in *Crutcher* and followed today—that the State must show a defendant was under arrest in order to justify a warrantless search incident to an arrest—is obviously important and must be followed, in order

to avoid an attempt by the government to "shoehorn" an invalid search into the "incident to arrest" exception after the fact, and to avoid the devolution of the exception into a "search incident to probable cause to arrest" exception. *See Commonwealth v. Washington*, 449 Mass. 476, 869 N.E.2d 605, 611–12 (2007) (observing that "[t]o permit a search incident to arrest where the suspect is not arrested until much later ... would sever this exception completely from its justifications ... [and] in effect, create a wholly new exception for a 'search incident to probable cause to arrest.'" (citations omitted)); *Evans*, 400 N.Y.S.2d 810, 371 N.E.2d at 531 (stating "the police may not utilize the existence of probable cause as a trump card to justify warrantless personal searches"); *see generally* Wayne A. Logan, *An Exception Swallows a Rule: Police Authority to Search Incident to Arrest*, 19 Yale L. & Pol'y Rev. 381 (2001). The officers' misconduct in running afoul of this principle under the facts presented here, however, lacks a quality of purposefulness or flagrancy. The Court of Criminal Appeals, applying the attenuation analysis in a recent case, observed that "[t]here is no evidence that the officers in this case were attempting to circumvent the Defendant's Fourth Amendment rights in conducting official police activity, rather than mistaking whether their actions were constitutionally permissible." *State v. Greene*, No. E2008–00884–CCA–R3–CD, 2009 WL 3011108, at *9 (Tenn.Crim.App. Sept. 22, 2009). The same is true regarding the officers' actions in this case. This factor weighs in favor of attenuation and against suppression of the evidence found at the Defendant's residence.

We conclude that the evidence found at the Defendant's residence—the pistol, bulletproof vest, narcotics, drug paraphernalia, and cash—was not required to be suppressed in this case, because the De-

fendant's consent was valid and voluntary and the evidence was not obtained by exploitation of the prior improper search.

### Conclusion

In summary, we hold that the warrantless search of the Defendant's person was constitutionally invalid because it was not made incident to a lawful arrest. The subsequent search of the Defendant's residence was valid based on his voluntary consent, and the fruits of that search were not required to be suppressed under the exclusionary rule. The Defendant's convictions for the sale of .5 grams or more of cocaine and conspiracy to sell .5 grams or more of cocaine are reversed, and the case is remanded to the Circuit Court for Marshall County for further proceedings consistent with this opinion. The Defendant's remaining convictions are affirmed. Costs of this appeal are assessed one-half to the Defendant, Ungandua Ingram, and one-half to the State of Tennessee.