IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs June 6, 2017

## STATE OF TENNESSEE v. DEANDRE BONDS, AKA ISRAEL EL-ELYON

**Appeal from the Criminal Court for Shelby County**
**No. 15-01703        James M. Lammey, Jr., Judge**

_____

### No. W2016-01549-CCA-R3-CD

_____

The Appellant, Deandre Bonds, aka Israel El-Elyon,[1] was convicted in the Shelby County Criminal Court of one count of driving on a cancelled, suspended, or revoked license, second offense, and one count of evading arrest, both Class A misdemeanors, for which he received a total effective sentence of six months. On appeal, the Appellant contends that the evidence is not sufficient to support the convictions. Based upon our review, we conclude that the judgments of conviction incorrectly note the convictions are Class B misdemeanors; accordingly, the case is remanded to the trial court only for entry of corrected judgments reflecting that the offenses are Class A misdemeanors. The trial court's judgments are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Stephen C. Bush and Barry W. Kuhn (on appeal) and Robert Felkner (at trial), Memphis, Tennessee, for the Appellant, Deandre Bonds, aka Israel El-Elyon.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Bridgett Stigger, Tyler Parks, and Gavin Smith, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

---

[1] At the beginning of trial, the Appellant's trial counsel informed the trial court that the Appellant had a "court-ordered name change" to Israel El-Elyon and stated that the Appellant preferred to be addressed by that name.

# I. Factual Background

In April 2015, the Shelby County Grand Jury returned a multi-count indictment against the Appellant charging him with driving on a cancelled, suspended, or revoked license; driving on a cancelled, suspended, or revoked license, second offense; and evading arrest. At trial, Kendra White, an employee of the Tennessee Department of Safety and Homeland Security's Driver's Services Division, testified that the Appellant's driving records reflected his driver's license was revoked on August 31, 2009, and had not been reinstated at the time of trial.

On cross-examination, White said the records did not reflect that the Appellant had made any attempts to have his license reinstated. White noted that the Appellant's driver's license was revoked because of an accident.

Officer Mario Tate with the Memphis Police Department testified that he and his partner, Officer Marcus Stevens, were working the "Bravo shift" from 7:00 a.m. to 3:00 p.m. on July 14, 2014, and he noticed a man driving a motorcycle without a helmet. The man was identified later as the Appellant's brother, Brandon Jackson. While Officer Tate was watching, Jackson stopped the motorcycle in the parking lot of Windridge Elementary School, got off the motorcycle, and the Appellant got on the motorcycle. As Officer Tate watched, the Appellant, who also was not wearing a helmet, drove the motorcycle from the parking lot of the elementary school, across a public street, and into the parking lot of the Village Green Apartment complex.

Officer Tate decided to stop Jackson for operating a motorcycle without a helmet.[2] When Officers Tate and Stevens approached Jackson, the Appellant parked the motorcycle and walked back toward the officers. Officer Tate noticed "another group of guys" standing ten or fifteen feet away, just outside the gate of the apartment complex. The officers called for backup because they "were outnumbered. There was two of us and like four or five of them."

Officer Tate asked Jackson to explain why he was driving the motorcycle without a helmet and to provide the officers with identification. Jackson refused to identify himself. The Appellant "started causing a disturbance" and maintained that "they didn't have to identify themselves" because "they were free men." The Appellant and Jackson then began talking about "sovereign citizenship." At that point, Officers Tate and Stevens attempted to detain Jackson, and "a struggle ensued."

---

[2] See Tenn. Code Ann. § 55-9-302.

During the struggle, Officers Tukes and Garrett arrived. Officer Tate told them that the Appellant had driven the motorcycle without a helmet and asked them to detain the Appellant. After Officer Tate asked the backup officers to detain the Appellant, the Appellant "took off running."

Officer Louie Tukes with the Memphis Police Department[3] testified that he responded to Officer Tate's call for backup. When Officer Tukes arrived at the scene, he saw Officers Tate and Stevens "struggling" to take Jackson into custody. During the struggle, the Appellant was "disorderly," "talkin[g] loud," and telling the officers they had no authority to interfere with him. Officer Tukes asked the Appellant to be quiet and not to disturb the scene. Officer Tate told Officer Tukes that the Appellant was a suspect and asked the Appellant to approach the officers, but the Appellant ran into the apartment complex. Officers Tukes and Garrett pursued him. Officer Garrett got close to the Appellant first, and the Appellant "squared up" and "put his knuckles up" to fight Officer Garrett. Officers Tukes and Garrett then had to physically restrain the Appellant to take him back to the scene. Officer Tukes obtained the Appellant's name, and a computer search revealed that the Appellant's driver's license was suspended.

Officer Tukes said that the Appellant had drawn "a huge crowd of onlookers based off the verbiage that he used on the scene and his tone and demeanor were very violent – aggressive." The Appellant said that "he doesn't go by the name DeAndre. That's his government name. It's a straw man; it's not his true identity."

On cross-examination, Officer Tukes acknowledged that he never told the Appellant that he was a Memphis police officer but asserted that his uniform, vest, and police cruiser clearly identified him as a Memphis police officer.

The Appellant testified that he had prior convictions of driving on a suspended license and aggravated burglary. The Appellant acknowledged that he did not have a driver's license and that it was revoked due to a traffic accident.

The Appellant said that on the day of his arrest, he was driven to his sister's apartment in the Village Green Apartment complex by his friend, Gregory Westbrook. The Appellant's sister was supposed to drive the Appellant to school later that morning. After exiting Westbrook's vehicle, the Appellant saw two police officers detaining two people in the park. The Appellant went into his sister's apartment then came back outside and sat on the steps. The Appellant's younger brother, Brandon Jackson, and two other men, Raymond Harwell and Leroy Love, were standing on the sidewalk, watching the police.

---

[3] Memphis Police Officer David Garrett's testimony essentially duplicated Officer Tukes's testimony.

The Appellant said that when the police left the park, they drove their cruiser beside Jackson, Harwell, and Love and requested their identification. Harwell and Love complied, but Jackson began asking questions. The officers stopped their cruiser, got out, and "slammed [Jackson] on his back." The Appellant walked over to see what was happening. One of the officers told the Appellant that "it was none of [his] business" and that Jackson was "a grown man" who could "handle his own affairs." The officer told the Appellant to walk away, and the Appellant obeyed but kept watching. The Appellant waited for the officers to leave with Jackson and asked other officers to "have their supervisor pull up." The Appellant said that he felt he had a "responsibility" to know what was happening to his brother.

The Appellant said that he did not see Jackson riding a motorcycle but acknowledged that Jackson "was in possession of a motorcycle." The Appellant denied riding the motorcycle.

The Appellant said that two officers spoke with the supervisor, Officer Pruitt, when he arrived at the scene. The officers then told the Appellant to "come here," but he refused. He explained that "they just told me to walk off, and I didn't feel like I had to come back." The Appellant said that after he refused to approach the officers, fifteen officers ran towards him, and he ran to protect himself. Nevertheless, the police caught him. The Appellant questioned why he was being detained, and Officer Tukes responded, "Disorderly conduct." The Appellant overheard Officer Tukes ask Officer Tate what the Appellant did, and Officer Tate replied that the Appellant "did nothing." Officer Tukes then asked what the officers were supposed to do "because they done put their hands on" the Appellant. Officer Tate responded that the Appellant should be charged with the same charges as Jackson. After the Appellant was arrested, he learned that he and Jackson were charged with "taking turns on a bike."

On cross-examination, the Appellant said that Jackson was "doing absolutely nothing" when the police approached him. He maintained that Jackson did not "own a motorcycle, but he was in possession of a motorcycle," which the Appellant thought belonged to his uncle. The Appellant maintained that he did not know how to ride a motorcycle and that Jackson was not teaching him to ride a motorcycle. The Appellant said that Jackson was not on the motorcycle when the Appellant saw him. However, when they were being booked, Jackson told the Appellant that he was on a motorcycle."

The Appellant said that he thought the officers "fabricated a story" about him "because they felt that [he] questioned their authority when [he] wasn't questioning their authority. [He] was just asking what was going on." He denied telling the officers that they did not have authority over him.

- 4 -

The Appellant asserted that he had paid some fines in an effort to get his driver's license reinstated and that he did not know why his driving record did not reflect any payments. He acknowledged that he thought the government was violating his rights by requiring that he have a driver's license.

The Appellant stated:

> as far as me and my brother taking turns on a motorcycle, that is incorrect. And as far as me being in the presence of [the police] and running, that's incorrect because I was asked to come here, and they ran towards me, and all I did was try to protect myself so I wouldn't get slammed on that concrete slab. That hurt. I have seen people get slammed on their back, and when their head smacked the ground, there's no telling what happened. I just didn't want to get slammed on the concrete.

The Appellant said, "[I]f I'm not under arrest, and you tell me to leave the scene, and I leave the scene and I don't want to talk, that's my right. I don't have to talk." The Appellant said that he was never charged with disorderly conduct.

The Appellant acknowledged that the police may have seen Jackson riding a motorcycle but did not immediately "take any action with him" because they were speaking with two other people in the park. The Appellant denied that the police asked for his identification. He acknowledged that they asked his name after he was in the patrol car and that he told them his name was Israel El-Elyon. The Appellant said that Jackson thought if he pled guilty to riding a motorcycle without a helmet, the police would release the Appellant. The Appellant acknowledged that he had seen an affidavit signed by Jackson but said that he was unaware that Jackson asserted he was teaching the Appellant to ride the motorcycle.

On redirect examination, the Appellant denied that Jackson was teaching him to ride the motorcycle, asserted that he did not know how to ride a motorcycle, and stated that he was "actually scared of motorcycles."

The jury found the Appellant guilty of driving on a cancelled, suspended, or revoked license and evading arrest. The Appellant acknowledged that because he had a prior conviction of driving on a cancelled, suspended, or revoked license, the instant conviction was a Class A misdemeanor. The trial court sentenced the Appellant to concurrent sentences of six months in the workhouse for each conviction. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his convictions.

## II. Analysis

The Appellant contends that the evidence is not sufficient to support his convictions. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

First, the Appellant challenges the sufficiency of the evidence sustaining his conviction of driving on a cancelled, suspended, or revoked license, arguing that the State failed to prove the elements of the offense as defined in the statute. Tennessee Code Annotated section 55-50-504(a)(1), which defines the offense, provides:

> A person who drives a motor vehicle within the entire width between the boundary lines of every way publicly maintained that is open to the use of the public for purposes of vehicular travel, or the premises of any shopping center, manufactured housing complex or apartment house complex or any other premises frequented by the public at large at a time when the person's privilege to do so is cancelled, suspended, or revoked commits a Class B misdemeanor.

Tenn. Code Ann. § 55-50-504(a)(1); see also Donald M. Taylor v. Michael C. Greene, Comm'r of the Tennessee Dep't of Safety, No. M1999-00594-COA-R3-CV, 2002 WL

75929, at *3 (Tenn. Ct. App. at Nashville, Jan. 22, 2002) ("A person who drives on public roads after revocation of his or her license, but before reissuance or renewal of a license, is 'driving at a time when the person's privilege to do so is cancelled, suspended, or revoked' within the meaning of Tenn. Code. Ann. § 55-50-504(a)(1)."). The State responds that the evidence was sufficient. We agree with the State.

At trial, Officer Tate testified that he saw the Appellant drive a motorcycle across Village Grove, which he described as a "public street" and agreed was "mainly a residential street" in "a rather residential area." Further, White testified, and the Appellant acknowledged, that his license was revoked at the time. We conclude that the evidence was sufficient to sustain the Appellant's conviction for driving on a revoked license. State v. Dennis Haughton Webber, No. M2014-02527-CCA-R3-CD, 2015 WL 6774014, at *3 (Tenn. Crim. App. at Nashville, Nov. 6, 2015).

The Appellant also argues that the evidence is not sufficient to support his conviction of evading arrest because he did not know that Officer Tate was attempting to arrest him. The State maintains that it adduced ample proof that the Appellant knew the police were trying to arrest him. We agree with the State.

Tennessee Code Annotated section 39-16-603(a)(1) provides:

> [I]t is unlawful for any person to intentionally conceal themselves or flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person:
>
> (A) Knows the officer is attempting to arrest the person; or
>
> (B) Has been arrested.

Tenn. Code. Ann. § 39-16-603(a)(1).

An arrest is "the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." State v. Ingram, 331 S.W.3d 746, 757 (Tenn. 2011) (internal quotation marks and citations omitted). However, "[a]n arrest may be affected without formal words or a station house booking." Id. (internal quotation marks and citation omitted).

In the light most favorable to the State, the proof adduced at trial revealed that Officers Tate and Stevens saw the Appellant and his brother, Jackson, each driving a

motorcycle without wearing a helmet. During a confrontation with Jackson about his failure to wear a helmet while driving a motorcycle, Jackson refused to provide the officers with any identification, and the officers struggled to detain him. The Appellant approached Officers Tate and Stevens and "started causing a disturbance." When backup officers arrived, Officer Tate told Officer Tukes to detain the Appellant. When Officer Tate told the Appellant to approach the officers, the Appellant "took off running." Officers Tukes and Garrett gave chase. Encountering a "dead end," the Appellant turned, raised his fists, and tried to fight the officers, but they were able to apprehend him. From the foregoing, we conclude that a rational jury could conclude that the Appellant evaded arrest. See State v. Russell, 10 S.W.3d 270, 276 (Tenn. Crim. App. 1999) (stating that defendant was close enough to hear one officer instruct a second officer to arrest defendant and that "his immediate flight indicates that he did hear it").

Finally, the State contends the judgments of conviction should be remanded for correction, noting that the Appellant admitted he had a prior conviction of driving on a revoked license and that the parties agreed the instant conviction was therefore a Class A misdemeanor. Tenn. Code Ann. § 55-50-504(a)(2). Further, the Appellant's conviction of evading arrest was a Class A misdemeanor. Tenn. Code Ann. § 39-16-603(a)(3). The trial court specifically stated that it was sentencing the Appellant for Class A misdemeanors and imposed appropriate sentences of six months. However, the judgments of conviction reflect that each of the convictions were Class B misdemeanors. Therefore, we remand to the trial court only for entry of corrected judgments reflecting that the convictions are Class A misdemeanors, not Class B misdemeanors.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court but remand for correction of the judgments of conviction.

_____
NORMA MCGEE OGLE, JUDGE