# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### October 25, 2011 Session

## STATE OF TENNESSEE v. DAVID INGRAM OWNBY, ALIAS

### Appeal from the Criminal Court for Knox County
### No. 91543      Jon Kerry Blackwood, Senior Judge[1]

### No. 2011-00543-CCA-R3-CD - Filed May 3, 2012

Following the Knox County Criminal Court's denial of his motion to suppress evidence, the Defendant, David Ingram Ownby, alias, entered a guilty plea to driving under the influence (DUI), first offense. The trial court sentenced the Defendant to forty-eight hours incarceration, placed him on unsupervised probation for eleven months and twenty-nine days, and ordered the Defendant to pay a $350 fine. Pursuant to Rule 37(b)(2)(A) of the Tennessee Rules of Criminal Procedure, the Defendant reserved a two-part certified question of law challenging the legality of his seizure and subsequent arrest. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which and NORMA MCGEE OGLE, J., joined. JAMES CURWOOD WITT, JR., J., concurring.

Steven Oberman, Knoxville, Tennessee (at trial and on appeal); Sara Compher-Rice, Knoxville, Tennessee (on appeal); and, Ann. C. Short, Knoxville, Tennessee (on appeal); for the appellant, David Ingram Ownby, alias.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kenneth F. Irvine, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

---

[1] Judge Jon Kerry Blackwood replaced Judge Richard Baumgartner after the suppression hearing and waiver of jury trial was executed.

## FACTUAL BACKGROUND

The record reflects that the Defendant was arrested on November 25, 2008. He was subsequently indicted on April 27, 2009, for DUI and violation of the implied consent law. On October 6, 2009, the Defendant filed a motion to suppress evidence and dismiss the charges, alleging that he was unlawfully arrested. The suppression hearing was held on January 7, 2010.

The only testimony offered at the suppression hearing was that of the arresting officer, Coy Tucker. Officer Tucker testified that at the time of the Defendant's arrest, he had been a police officer for approximately three years. Officer Tucker explained that he had received DUI training from the police department under the National Highway Traffic Safety Administration Guidelines.

Officer Tucker testified that on November 25, 2008, he was working the "82 gulf" shift, which covers the hours of 6:00 p.m. through 4:00 a.m. He testified that he was dispatched to "the McDonald's attached to the Pilot [at] 206 Walker Springs Road" in Knoxville at approximately 8:58 p.m., regarding "a male passed out in a red Dodge sedan in the drive through." When Officer Tucker arrived, he "drove around the drive-through the correct way . . . and faced [the Defendant's] car." He testified that he observed the Defendant "passed out behind the wheel of the vehicle[, and] the vehicle was facing the wrong way in the drive-through." Officer Tucker explained that he parked his car facing the Defendant's vehicle and next to another car placing an order in the McDonald's drive-through. The officer testified that he initially shined his spotlight on the Defendant but detected no response; Officer Tucker activated his blue lights. At this point, Officer Tucker got out of his car, approached the Defendant's vehicle, and attempted to wake him. Officer Tucker testified that the Defendant's car was not running, but he believed that the keys were in the ignition. The officer stated that, initially, the Defendant was slow to respond to his attempts to wake him.

Officer Tucker explained that he asked the Defendant to open the car door, so they could talk. The officer further explained that he was trying to "figure out what was wrong with [the Defendant], because at the time [Officer Tucker] believed that there was something medically wrong with [the Defendant] since he was passed out behind the wheel of the vehicle." Officer Tucker testified that the Defendant eventually opened the door, and, at that point, he smelled "an odor of an alcoholic beverage coming out of the vehicle." Officer Tucker then testified that he asked the Defendant to get out of the vehicle, and the Defendant refused. The officer stated that he believed the Defendant possibly reached for his gearshift, which posed a safety concern. Officer Tucker testified that the Defendant had slurred speech, and when the Defendant looked up at him, "he had glassy, watery eyes, blood--red,

bloodshot."

Officer Tucker testified that he reached in the Defendant's car and unbuckled his seat belt to "get [the Defendant] out of the car to talk to him." He explained that when he leaned in to remove the Defendant's seat belt, "it was very noticeable that he was the source of the alcoholic beverage smell." The officer also testified that the Defendant refused to get out of the car and could hardly stand when he pulled the Defendant out. Officer Tucker testified that "at this point . . . it was obvious to [him] that [the Defendant] was intoxicated."

Officer Tucker testified that he placed the Defendant in handcuffs immediately after pulling him out of the car because "he was already just completely disregarding verbal commands and there was already at least one arrestable offense." The officer explained that he believed that he had at least enough evidence to charge the Defendant with public intoxication, so he had the Defendant sit on his cruiser. Officer Tucker continued to talk with the Defendant while emergency medical technicians (EMTs), who had arrived on the scene earlier, checked on the Defendant and asked him questions to see if he had a medical issue. The officer explained that, although unusual, he allowed the EMTs to talk with the Defendant and check him out because the call initially "came in as a sick person call." After the EMTs checked the Defendant, Officer Tucker told the Defendant that he was under arrest. Officer Tucker testified that the Defendant refused to consent to a blood alcohol test by stating, "I want to talk to my lawyer first." He testified that he then explained the charges to the Defendant, read the implied consent form to him, and subsequently transported him to jail.

On cross-examination, Officer Tucker admitted that he could not recall whether he or the Defendant opened the Defendant's door. The officer agreed that, once the door was open, he yelled at the Defendant to take off his seat belt and subsequently removed the Defendant's seatbelt because he was not moving fast enough for him. Officer Tucker admitted that the Defendant never started his vehicle or put his hand on the key and that he "couldn't see whether or not the Defendant ever looked away from him toward the dashboard or gearshift." Officer Tucker agreed that a person does not have all of their normal faculties about them when he or she first wakes up. Officer Tucker also agreed that a person's speech is not as clear when they first wake up from a deep sleep as it is a few minutes later.

Officer Tucker explained on cross that the Defendant was either having trouble standing or was trying to get away from him when he pulled the Defendant out of the car. Officer Tucker further explained that he then "grabbed [the Defendant,] . . . pulled him out of the car" and "[i]mmediately threw [the Defendant] against his car." The officer admitted that he never saw the Defendant walk, nor was the Defendant out of his grasp before he handcuffed the Defendant. The officer's cruiser video was played for the judge and admitted

into evidence. Officer Tucker agreed that the video accurately depicted what occurred during the arrest of the Defendant. Officer Tucker admitted on cross-examination that he did not question the Defendant about his condition before pulling him out of the car.

Although the officer admitted on cross-examination that the mere smell of alcohol on someone's breath does not establish how much they have had to drink, on redirect, Officer Tucker explained that the stench of alcohol on the Defendant's breath was strong.

After hearing the evidence and listening to the arguments of counsel, the trial court denied the Defendant's motion to suppress. The trial court found that the Defendant was "seized immediately upon arrival by the officer, and it's clear that he was not free to go once the officer arrived there." When the officer arrived, he found the Defendant's car parked in the wrong direction in the McDonald's drive through. Officer Tucker shined his spotlight in the Defendant's car and observed that he was "asleep behind the wheel." When the Defendant did not respond to the officer's spotlight, the officer exited his cruiser and knocked on the Defendant's car window. "He got no immediate response. He knocked on [the window] again [and] tried to open the door." After at least two attempts to wake the Defendant,

> [the officer] was finally able to get some reaction from [the Defendant] who did not roll down the window but opened the door. . . . [A]ccording to the officer's testimony, when he opened the door [the Defendant] . . . was slow to respond to any questions and that he immediately noticed an odor of alcohol emanating from the vehicle itself.

The court found that the encounter "happened very quickly" and said that it believed the assertion by counsel that the entire incident occurred in "a matter of 34 seconds." The court credited the officer's testimony that the Defendant appeared to be reaching for his gearshift because it appeared to be corroborated by the video, in which the officer stated, "You're not going anywhere. It's in park." The court concluded that the Defendant must have made some action involving the gearshift for the officer to make that statement. In sum, the court reasoned as follows:

> The vehicle is sitting there. The keys are in the ignition. Apparently, it's--the vehicle's not running. The headlights are off. Very [suspicious] activity. This might be on private property, but it's certainly property that's used by the public at large, and someone--someone sitting there in a vehicle asleep in the drive-through lane headed the wrong way is going to cause suspicion from the general public and certainly suspicion to the police officer.

So certainly this is a--this gives the officer a basis to--to do some investigation of this situation, and what happens here, as he does that investigation, he can't arouse [the Defendant] initially. He finally arouses him, opens the door, notices this odor of alcohol. He's unable to get satisfactory responses from him, although during a very short period of time, and I acknowledge that. Leans in. He does not remove his seat belt as ordered to do.

Again, all this happened very quickly, but it's not happening quickly enough for Officer Tucker's satisfaction. So he reaches in to release the seat belt. When he does that, he says he smells a very strong odor of alcohol that's emanating directly from [the Defendant] and makes a decision at that point and time that [the Defendant] is intoxicated. He's clearly, in my judgment, in control of this vehicle, operating this vehicle on a public thoroughfare. I mean, he may be on private property at this point in time, but to get there, he has to operate it on a public thoroughfare, and this is a public parking lot and subject to--subject to the law of the land. I mean, this is not like you're in your driveway.

. . . I think that the totality of the circumstances provided Officer Tucker with probable cause to believe that a crime has been committed, and that is that [the Defendant] had been operating his vehicle while under the influence. In addition to the strong odor of alcohol and all the circumstances about his being in this vehicle and the condition that he was in, Officer Tucker testified that he had bloodshot eyes and slurred speech, that he was unsteady on his feet when he got him out.

Again, when we take all of the circumstances into account, I believe the case made a--the state has made a prima facie case for the finding of probable cause to justify this arrest.

The Defendant subsequently pled guilty to DUI, first offense, and reserved a certified question of law with the consent of all required parties. This appeal followed.

ANALYSIS

The Defendant contends that the "investigatory stop which led to his arrest was not based upon reasonable suspicion and was in violation of the Fourth Amendment of the United States Constitution and [a]rticle I, [s]ection 7 of the Tennessee Constitution." The

-5-

Defendant also contends that his warrantless seizure and arrest from his parked vehicle was not based upon probable cause and that the community caretaking exception did not justify the initial actions of the officer that ultimately led to his arrest. The State responds that the trial court correctly denied the Defendant's motion to suppress because under a totality of the circumstances the officer had reasonable suspicion to believe that the Defendant was committing or about to commit a crime. The State also asserts that this court should not address the community caretaking issue because "the Defendant did not raise this issue in his motion to suppress[,]" and "it is well settled that an appellant cannot change grounds for objections from the trial court to the appellate court."[2]

Tennessee Rule of Criminal Procedure 37 permits a criminal defendant to plead guilty and appeal a certified question of law when the defendant has entered into a plea agreement under Rule 11(a)(3) of the Rules of Criminal Procedure and has "explicitly reserved -- with the consent of the state and of the court -- the right to appeal a certified question of law that is dispositive of the case." Tenn. R. Crim. P. 37(b)(2)(A). As a prerequisite to this court's review, the final order or judgment appealed from must contain a statement of the certified question that clearly identifies the scope and legal limits of the question, including the agreement by both the defendant, the trial court, and the state that the question is dispositive of the case and is explicitly reserved for appellate review as part of the plea agreement. State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988). The State concedes that the Defendant properly reserved this question.

The "trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). When the trial court has seen and heard the witnesses testify, we must afford considerable deference to the factual determinations made by the trial court. Madden v. Holland Grp. of Tenn., Inc., 277 S.W.3d 896, 898 (Tenn.2009). Although "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence," Odom, 928 S.W.2d at 23, the burden remains on the State to prove that a warrantless search or seizure was constitutionally permissible. State v. Nicholson, 188 S.W.3d 649, 656–57 (Tenn. 2006); State v. Henning, 975 S.W.2d 290, 298 (Tenn. 1998). "The issue of whether

---

[2] The State argues that this issue should not be addressed because the Defendant did not cite it in his motion to suppress. However, the Defendant did assert it as an alternate theory for suppression during closing arguments on the motion, and all parties agreed to the certified question. Because the trial court had an opportunity to rule on the applicability of the community caretaking function to this set of facts but chose not to address it in issuing its ruling, this court may address the issue as presented in the certified question reserved with the consent of all parties. Nevertheless, we decline to address its applicability in the instant case because the State solely relies on reasonable suspicion and explicitly rejects the theory of community caretaking to justify the officer's actions.

reasonable suspicion existed to validate a traffic stop is a mixed question of fact and law." State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). We review the trial court's application of law to the facts de novo without a presumption of correctness. State v. Day, 263 S.W.3d 891, 900 (Tenn. 2008); State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. Any warrantless search or seizure is presumed to be unreasonable and the evidence discovered as a result thereof is subject to suppression unless the State proves by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998); Nicholson, 188 S.W.3d at 656; State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The protections of the Fourth Amendment and article I, section 7 apply "to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007) (quoting United States v. Brignoni–Ponce, 422 U.S. 873, 878 (1975)). An officer's stop of a vehicle by activating his or her emergency lights constitutes a seizure. Day, 263 S.W.3d at 902; Garcia, 123 S.W.3d at 343; State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000). Our supreme court has recognized "three distinct levels of interaction between citizens and law enforcement officials." State v. Ingram, 331 S.W.3d 746, 755–56 (Tenn. 2011). In Ingram, the supreme court outlined the following levels of interaction:

> The first and most limited interaction is the brief police-citizen encounter, which requires no objective justification and is limited to informal questioning of the person involved. Day, 263 S.W.3d at 901. The next level is the brief investigatory detention, which must be supported by reasonable suspicion of wrong-doing and entitles the officer to conduct a stop and frisk under the principles of Terry v. Ohio, 392 U.S. 1 (1968). Day, 263 S.W.3d at 901. The third and most invasive level is the full-scale arrest, which must be supported by probable cause. Id.; accord. [State v.] Crutcher, 989 S.W.2d [295, 300 (Tenn.1999)].

331 S.W.3d at 756; see also State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006).

This case involves a brief investigatory detention, which occurred when Officer Tucker turned on his blue lights in front of the Defendant's vehicle in the McDonalds drive-through. An exception to the warrant requirement exists when a law enforcement officer "'makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed.'" Williams,

185 S.W.3d at 318 (quoting Binette, 33 S.W.3d at 218); see Terry v. Ohio, 392 U.S. 1, 20–21 (1968). Our supreme court has defined "reasonable suspicion" as " 'a particularized and objective basis for suspecting the subject of a stop of criminal activity.' " Day, 263 S.W.3d at 903 (quoting Binette, 33 S.W.3d at 218). The standard for determining reasonable suspicion is a lower standard than that for determining the existence of probable cause:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Yeargan, 958 S.W.2d at 632 (quoting Alabama v. White, 496 U.S. 325, 330 (1990)); see also United States v. Sokolow, 490 U.S. 1, 7–8 (1989).

The trial court's determination of whether a police officer's reasonable suspicion is supported by specific and articulable facts is an objective, fact-intensive inquiry. Williams, 185 S.W.3d at 318. It requires the court to consider the totality of the circumstances established by the proof. Day, 263 S.W.3d at 903. These circumstances include, but are "not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders." State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992). A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him. Terry, 392 U.S. at 21.

In the instant case, the trial court found that the Defendant was "seized immediately upon arrival by the officer," and the evidence in the record does not preponderate against that finding. Additionally, our supreme court has made it clear that when an officer turns on his blue lights, he seizes that defendant for Fourth Amendment purposes. Therefore, the lawfulness of the stop turns on whether Officer Tucker had a reasonable, articulable suspicion that the Defendant was engaged in or was about to engage in criminal activity at the time he effectuated the seizure.

Construing the facts in a light most favorable to the State, Officer Tucker testified that he received a call from dispatch informing him that "there was a male passed out in a red-dodge sedan in the drive through . . . [at] the McDonald's attached to the Pilot." The officer testified that when he first pulled up, he "saw the Defendant passed out behind the wheel of the vehicle . . . facing the wrong way in the drive-through[,]" confirming the initial complaint from McDonalds. The officer activated his spotlight, and after detecting no response from the Defendant, he activated his blue lights. The totality of the circumstances suggests that

upon arriving at the scene, the officer developed a basis to do some investigation of the situation because the location and positioning of the car were very suspicious, and the Defendant's lack of response to the spotlight was also suspicious. While these facts in isolation may not give rise to reasonable suspicion, taken together they could suggest to a reasonable person that criminal behavior is afoot or looming. See Illinois v. Wardlow, 528 U.S. 119, 124-125; see also State v. Randolph, 74 S.W.3d 330, 336.

Turning to probable cause for the arrest, after activating his blue lights, Officer Tucker then proceeded to the Defendant's vehicle to try to wake him. Officer Tucker testified that he was trying to get the Defendant to talk to him because he "believed there was something medically wrong with [the Defendant] since he was passed out behind the wheel of the vehicle." The Defendant was very slow to respond to Officer Tucker's demands to open his car door, and the officer noticed that the Defendant's keys were still in the ignition. Officer Tucker testified that he believed that the Defendant reached for his gear shift, which posed a public safety concern. After the Defendant finally unlocked the door, the officer opened it and smelled the stench of alcohol. Once the officer managed to unbuckle the seat belt and get the Defendant out of the car, he was certain that the Defendant was the source of the alcohol smell, and he placed the Defendant in handcuffs. Officer Tucker testified that he believed at that point that the Defendant was at least guilty of public intoxication. The officer also testified that the Defendant had bloodshot eyes, slurred speech, and was unsteady on his feet when he pulled the Defendant out of the car. These facts taken together "would warrant a man of reasonable caution in the belief that a criminal offense has been committed." Carroll v. U.S., 267 U.S. 132, 162 (1925). The officer allowed the EMTs to speak with the Defendant, to ensure that he did not have a medical issue and, at some later point, informed the Defendant that he was under arrest for DUI.

Under these facts, the officer had the requisite reasonable suspicion to seize the Defendant and conduct some investigation, and he later ascertained the requisite probable cause to effectuate the arrest. Thus, the Defendant's seizure and subsequent arrest were not in violation of his constitutional rights. Accordingly, we affirm the judgment of the trial court.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the court is affirmed, and we remand to the trial court for entry of the judgment below.

_____
D. KELLY THOMAS, JR., JUDGE

JAMES CURWOOD WITT, JR., J., concurring.

I concur in that the facts of the case would engender a reasonable suspicion that the defendant was driving while impaired. I would emphasize that the presence of the defendant's vehicle headed in the wrong direction in the restaurant's drive-through lane, in addition to the condition of the driver, is the fact that justifies the seizure.

By contrast, in *State v. James David Moats*, No. E2010-02013-CCA-R3-CD (Tenn. Crim. App., Knoxville, Nov. 8, 2011), the police officer who arrested Mr. Moats for driving under the influence originally observed him at about 2:00 a.m. as he was sitting in his car parked in the parking lot of a grocery store. The store was closed at that hour. The officer drove her cruiser up to Mr. Moats's vehicle and activated her blue lights. The trial court denied Mr. Moats's motion to suppress the discovery of evidence of his intoxication, but this court reversed, stating

> Under the authority of [*State v.*]*Williams*, [185 S.W3d 311 (Tenn.2006),] it is clear that Sergeant Bige seized the defendant the moment she activated her emergency lights because the use of the lights was a show of authority and a reasonable citizen would not have felt free to leave. *See* [*Williams*, 185 S.W.3d] at 317. She was not performing a community caretaking function because, as she testified, there was no indication that the defendant needed assistance nor was there any other evidence that she needed to activate the lights for safety reasons. Additionally, Sergeant Bige had no reasonable suspicion of illegal activity. She testified that she thought it was strange that a truck was parked in the grocery store parking lot near 2:00 a.m. with its lights on. Essentially, she had an "inchoate and unparticularized suspicion or hunch," which does not rise to the level of reasonable suspicion. *Terry* [*v. Ohio*, 392 U.S. 1, 27 (1968)]. Without reasonable suspicion, her seizure of the defendant violated the constitutional prohibition against unreasonable seizures. Therefore, we conclude that the evidence does not support the trial court's findings and reverse the trial court's determination that the officer did not seize the defendant without reasonable suspicion when she activated her emergency lights.

*Id.*, slip op. at 6.

-10-

In *James David Moats*, the presence of a sleeping or inattentive person in a vehicle that is not parked so as to suggest that an impaired driver parked it did not, without more, justify a reasonable suspicion to seize the person. By contrast, in the present case, the defendant was not only sleeping or unconscious in his vehicle but also had apparently parked it in a manner that suggested his impairment.

Given the likely frequency with which officers discover sleeping drivers inside their parked vehicles, I believe the distinction made above is important.

_____
JAMES CURWOOD WITT, JR., JUDGE