# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 29, 2013

## STATE OF TENNESSEE v. DANE SAYLES, ALIAS BRADLEY HARPER

**Appeal from the Criminal Court of Hamilton County**
**No. 268630     Rebecca J. Stern, Judge**

---

**No. E2012-00138-CCA-R3-CD - Filed May 3, 2013**

---

Dane Sayles, alias Bradley Harper ("the Defendant"), was convicted by a jury of possession with the intent to sell or deliver three hundred grams or more of cocaine. The trial court sentenced the Defendant as a Range II, multiple offender to forty years to be served consecutively to previous sentences the Defendant received in Pennsylvania. On appeal, the Defendant argues that the trial court erred in denying his motion to suppress the stop and search of his vehicle, as well as the seizure of cell phone text messages. The Defendant also asserts that the trial court erred in "permitting the State to continue adding witnesses in the middle of trial whose names were not provided in discovery." Finally, the Defendant challenges the length of his sentence. After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Donna Robinson Miller (on appeal) and Kelli Black (at trial), Chattanooga, Tennessee, for the appellant, Dane Sayles, alias Bradley Harper.

Robert E. Cooper, Jr., Attorney General & Reporter; Meredith DeVault, Assistant Attorney General; William H. Cox, III, District Attorney General; and Boyd Patterson and Charlie Minor, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

A Hamilton County Grand Jury indicted the Defendant and Marcus Harper ("the co-defendant") on one count of possession with the intent to sell or deliver three hundred grams or more of cocaine.[1] Prior to trial, the Defendant moved to suppress evidence seized as a result of what the Defendant alleged was an improper stop.

On December 8, 2008, the trial court held a suppression hearing. Officer Dale Lockhart of the Chattanooga Police Department ("CPD")[2] testified that on April 28, 2008, he stopped a vehicle in which the Defendant was a passenger. He had observed the vehicle driving sixty-six miles per hour in a fifty-five mile per hour zone. Then, "[b]efore pulling the vehicle over at a safe location [he] observed the vehicle making improper lane changes without using his turn signal in heavy traffic." Upon approaching the passenger side of the vehicle, he noticed that the co-defendant and the Defendant ("the co-defendants") seemed nervous,[3] making him suspicious of potential criminal activity. When Officer Lockhart asked for the co-defendant's driver's license and insurance, he handed Officer Lockhart his entire wallet. Additionally, the Defendant never would make eye contact with Officer Lockhart. According to Officer Lockhart, the Defendant was breathing heavily, and "the carotid artery in his neck was beating rapidly." On cross-examination, Officer Lockhart acknowledged that the age difference of the two individuals also contributed to his suspicion of criminal activity. Additionally, he did not see any luggage in the vehicle. On cross-examination, however, Officer Lockhart acknowledged that the luggage could have been in the trunk.

Officer Lockhart stated that he returned to his vehicle with the co-defendant's driver's license to run "a computer check." He then approached the passenger side of the stopped vehicle and asked the co-defendant to step out of the car. The co-defendant mentioned that he was applying for employment with a police department in Atlanta, Georgia, and did not want a ticket. Officer Lockhart informed the co-defendant that he would be giving the co-defendant a warning citation. As he filled out the citation, he asked the co-defendant about his trip. The co-defendant stated that they were traveling from Atlanta to Pennsylvania because "his sister was having a kidney transplant." Although the co-defendant stated that

---

[1] Although the other indictments were not included in the record, from the trial record we deduce that the co-defendant also was indicted on one count of speeding and one count of failure to maintain his lane of travel.

[2] At some point between the suppression hearing and trial, Officer Lockhart left the CPD.

[3] The co-defendant was in the driver's seat, and the Defendant was in the passenger's seat.

his sister was in the hospital, he could not recall the name of the hospital. Officer Lockhart did not allow the co-defendant to leave after writing the warning citation because of his "suspicion of criminal activity."

The co-defendant informed Officer Lockhart that the vehicle he was driving was a rental vehicle ("rental vehicle"). So Officer Lockhart examined the rental agreement and noticed that the vehicle was registered to a female who was not present in the rental vehicle. The agreement indicated that no one was to drive the vehicle except the person to whom it was registered. Officer Lockhart asked the co-defendant who the female was, and the co-defendant responded that she was the Defendant's girlfriend. When asked who the Defendant was, the co-defendant said that he was the co-defendant's uncle, but the co-defendant could not tell Officer Lockhart his name. The co-defendant offered to go ask for the passenger's name, but Officer Lockhart told him to stay where he was, and Officer Lockhart again approached the Defendant. He asked the Defendant for identification ("ID"), and the Defendant responded that he did not have an ID but did have a passport. The Defendant told Officer Lockhart that they were traveling to visit family. He asked the Defendant if someone was sick or if it was just a vacation. The Defendant then said, "[N]o, everything's fine, we're just going to see family."

After speaking with the Defendant, Officer Lockhart returned to speak with the co-defendant. He told the co-defendant that their stories did not match. The co-defendant denied having anything illegal in the vehicle. Officer Lockhart asked the co-defendant for consent to search, but the co-defendnt stated that he did not want Officer Lockhart searching the vehicle. According to Officer Lockhart, he then returned to his patrol car to request a K-9 unit. After informing the co-defendant of the request, the co-defendant stated that he would allow Officer Lockhart to search the vehicle. Accordingly, Officer Lockhart called and cancelled the request for a K-9 unit.

As Officer Lockhart approached the vehicle to search it, he noticed that he did not see "the seat belts sticking up from the [back] seat," so he lifted up the seat. Upon doing so, he found "two kilos of cocaine laying under the seat." He then placed both the co-defendant and the Defendant in custody.

On cross-examination, defense counsel entered the video from the stop into evidence. Officer Lockhart did not recall whether the rental agreement included a phone number for the female lessee but reiterated that no one but the person who signed the agreement was to drive the rental vehicle. He did not recall asking the co-defendant whether he had permission to drive the vehicle. He agreed that the only inconsistency in the co-defendant's story and the Defendant's story was that the co-defendant stated his sister was having a kidney transplant but that the Defendant stated that no one was sick and that they were simply going

to visit family. Officer Lockhart acknowledged that he ran a computer check on the Defendant's passport, but he did not remember the results of that check.

At the conclusion of the proof, the trial court took the matter under advisement but stated, "I'm going to tell you right now, I think the State has some problems and I'm leaning – if I had to rule right this minute I would be ruling for the defendant."

The suppression hearing continued on September 14, 2009, and, at that hearing, the Defendant called Twanda Campbell to testify. Campbell testified that she lived in Marietta, Georgia. On April 28, 2008, the Defendant was her boyfriend. On that afternoon, she was shopping with her mother, and she received a call on her cell phone from the Defendant. The Defendant informed Campbell that he needed to travel out of town on emergency for a sick family member in Pennsylvania and requested that Campbell rent him a car. Campbell, thereafter, went to Hertz Rental Car and rented a car for the Defendant. The Defendant and co-defendant met her there at Hertz. She rented a Chevrolet Impala and paid for the car using her credit card. After leaving Hertz, Campbell took the vehicle to Pep Boys and there gave the Defendant and co-defendant permission to take the vehicle to Pennsylvania. It was her understanding that both individuals would take turns driving the vehicle, and she had no objection to them doing so.

After Campbell parted ways with the Defendant, the next time she heard from him, he had been arrested in Hamilton County. Campbell denied having knowledge of anything being transported in that vehicle. She stated that her mother was in town from Pennsylvania and was visiting to help Campbell get settled into a new residence.

Campbell stated that she had known the Defendant for over twenty years but that she began dating the Defendant approximately five or six months prior to his arrest. She acknowledged knowing both of the names that the Defendant used. Campbell denied having continuous contact with the Defendant over the past twenty years. However, she had heard that the Defendant "had been in some trouble." She had not seen him for many years, and one of her relatives reconnected them when the Defendant came to visit.

Although the Defendant's permanent residence was in Pennsylvania, during that five or six-month period in which they were dating, the Defendant stayed with his sister in Georgia, which was where Campbell lived. Campbell denied that they were living together. She saw the Defendant a couple of times per week. To Campbell's knowledge, the Defendant was working for one of his relatives who had a moving company. She knew that the Defendant had children, but she only had met one of his daughters.

-4-

On cross-examination, Campbell acknowledged that she provided the Hertz Car Rental with her cell phone number. She denied, however, receiving a call from police officers in Hamilton County or the Hertz Car Rental regarding the vehicle. On redirect examination, she acknowledged that, through her job at State Farm Insurance, she received a 20% discount at Hertz Car Rental. She also confirmed that she never had been in any trouble criminally.

At the continued suppression hearing on September 28, 2009, Officer Lockhart again was called as a witness. He testified that, at the time of the incident at issue, he was a highway interdiction officer. Officer Lockhart "clocked" the Defendant's vehicle traveling sixty-six miles an hour in a fifty-five mile per hour zone and observed it making "sporadic lane changes" in heavy traffic. Accordingly, Officer Lockhart initiated his emergency equipment and stopped the vehicle. He recalled that the co-defendant was driving the vehicle at that time. He was not aware that the camera did not show any other vehicles pass during the time it was filming the stopped vehicle.

The co-defendant informed Officer Lockhart that the passenger was his uncle. When Officer Lockhart asked the co-defendant for his uncle's name, the co-defendant responded, "[D]o you want me to ask[?]" Officer Lockhart denied ever telling the Defendant or co-defendant that they were free to leave while he had them on the side of the road. Eventually, Officer Lockhart wrote a warning citation. He retrieved the co-defendant's driver's license as well as the rental agreement. Although he noticed that the rental agreement had Campbell's name, he did not call her to find out if the Defendant had permission to drive the car. He explained that the rental agreement had no additional drivers listed on the agreement other than Campbell.

At the conclusion of the proof at the suppression hearing, the trial court took the matter under advisement and issued a written ruling. In its written ruling, the trial court found that the Defendant and co-defendant were not de facto renters of the vehicle, so they did not have an expectation of privacy in the vehicle. The court further found that Officer Lockhart had the requisite reasonable suspicion to stop the vehicle because it was being driven in excess of ten miles per hour over the speed limit.

The trial court found that some of Officer Lockhart's suspicions did not rise to a level of reasonable suspicion sufficient to justify the duration of the stop. However, the trial court found the following suspicions reasonable: that the authorized driver of the vehicle was not present and the fact that the co-defendant could or would not provide Officer Lockhart with his uncle's name.

The trial court disagreed with the Defendant's assertion that the co-defendant's denial of consent was the basis of Officer Lockhart's suspicion. Rather, the trial court found that Officer Lockhart already had the requisite reasonable suspicion and, after being denied consent to search, pursued an alternative means of investigation. Finally, the court found that, although the Defendant never consented to the search of the vehicle, the co-defendant gave valid consent. Thus, the trial court denied the Defendant's motion to suppress.

At the jury trial of both the Defendant and the co-defendant, the trial court first addressed motions in limine filed by the Defendant. The first motion in limine addressed multiple photographs of the Defendant. The State informed the trial court that it likely would introduce these photographs only if the Defendant decided to testify. The trial court ruled that the State could not enter the photographs into evidence during the State's case-in-chief but that, if they became relevant later, the trial court would re-address them at that point. The next motion related to any testimony regarding any prior bad acts of the Defendant. The trial court agreed that nothing of that nature was admissible during the trial.

The counsel for the Defendant ("defense counsel") discussed the next motion which was a challenge to the State's addition of witnesses not previously provided. Defense counsel stated,

> There's not one single report anywhere in any discovery that comments on Mr. Hamilton, who's apparently the officer that modified the traffic video, that possibly did a phone dump and pulled information off of a phone. There is another officer, Jamie Hixson, with DEA, no reports or information that acknowledged that he was going to be here. And also on Jerry Smith, I had no knowledge that any of them were [sic] going to be here.

The trial court then verified with defense counsel that the State filed a motion to add these witnesses in May, but defense counsel insisted that she had no notice that such motion was filed or that it was part of the court file. The trial court responded, "I know, but you're sort of charged with that. But we're going to figure out a way to make that fair to you." The first witness discussed was Mark Hamilton, and the trial court stated that he would be permitted to testify but that defense counsel would have the opportunity to speak with him prior to his testifying. Defense counsel further challenged Hamilton's purported testimony as to the video and the information retrieved from the cell phones. The trial court stated that it would allow his testimony but that "we can get to relevance issues and admissibility issues."

The next witness they discussed was Jamie Hixson. The trial court allowed this witness to testify regarding drug trafficking on interstates, particularly the packaging of

narcotics. Another witness challenged by defense counsel was Jerry Smith, head of security for Hertz Car Rental. Defense counsel stated that she had no issue with Smith testifying as long as she had the opportunity to speak with him prior to his testimony. Finally, the trial court allowed Craig Johnson to testify as a chain of custody witness as long as defense counsel had an opportunity to speak with him prior to his testimony.

The State called Mark Hamilton as its first witness at trial. Mark Hamilton, employed through the CPD, testified as an expert in forensic technology, with an emphasis in cell phone and audio enhancement. On April 5, 2010, Sergeant Lewis had requested that Hamilton enhance the "audio for intelligibility on a DVD video." The video was from a camera mounted within Sergeant Lewis' vehicle. Sergeant Lewis wanted Hamilton to attempt to reduce the peripheral noise such as air conditioning and passing cars and trucks. Hamilton was able to reduce this "white noise" using a noise reduction software to make conversations on the video more understandable. He then converted the video back to a standard DVD format.

Hamilton testified that Sergeant Lewis also requested that he extract and analyze data from two cell phones: a Blackberry Pearl and a Nokia. Hamilton went to where the phones were stored by the department and checked them out for examination from March 18 until March 19 of 2010. Regarding the Nokia phone, he noticed that it was a "flip phone[]," but the phone would not stay closed. He charged the battery, placed it in a container that would disable the phone signal, and extracted the information from the phone onto a compact disc ("CD"). He completed a similar procedure in extracting from the Blackberry all data except the music.

Hamilton read from a report regarding a specific text message that was received on the Nokia phone at 8:28 p.m. on April 28, 2008. Then, he identified the same text message sent from the Blackberry phone at 8:26 p.m. Hamilton also identified a screen shot of the Blackberry phone displaying a text message that matched the content and date recorded in the report.

Officer Dale Lockhart with the Hamilton County Sheriff's Department testified that he previously was employed with the Dunlap Police Department and the CPD. He was a member of the CPD highway interdiction team for approximately five years. On April 28, 2008, Officer Lockhart was patrolling interstate 75 northbound in Hamilton County, which included his use of radar. At one point he observed a vehicle in which the co-defendants were traveling. According to his radar, the vehicle was traveling sixty-six miles per hour in a fifty-five mile per hour zone. Officer Lockhart also observed the vehicle make an improper lane change and fail to use its blinker. He pulled behind the vehicle and stopped the vehicle at the next safe location. On cross-examination, he acknowledged that, in his report, he

noted that he watched the improper lane change before observing the vehicle speeding. He identified the co-defendant as the driver and the Defendant as the passenger.

Officer Lockhart approached the passenger side of the vehicle and asked the co-defendant for his driver's license and proof of insurance. He noticed that the co-defendant seemed "nervous" and handed Officer Lockhart his entire wallet, rather than simply his driver's license. The co-defendant told him that the vehicle was a rental car, so he asked the co-defendant for the rental agreement. The Defendant retrieved the agreement from the glove compartment for Officer Lockhart. Officer Lockhart observed that the Defendant "was breathing hard" and "never made eye contact" with him.

Officer Lockhart noticed that the rental agreement indicated that the vehicle was rented in Campbell's name. He identified this agreement in court and noted that the phone number for Campbell and Hertz were not listed anywhere on the document. Upon making this observation at the scene, he returned to the rental vehicle and asked the co-defendant to step out of the car. The co-defendant explained that the Defendant's girlfriend had rented the car for them. The co-defendant called the Defendant his "uncle," and when Officer Lockhart asked him what was the Defendant's name, the co-defendant said, "[Y]ou want me to go ask him[?]" Officer Lockhart responded, "[N]o, I just figured you would know your uncle's name." When the co-defendant offered to go ask the Defendant, Officer Lockhart declined and stated that he would speak with the Defendant.

The co-defendant told Officer Lockhart that they were traveling from Atlanta, Georgia, to Pittsburgh, Pennsylvania, to visit his sister who was having a kidney transplant. The co-defendant could not tell Officer Lockhart the name of the hospital or where it was located. Another officer who arrived at the scene stayed with the co-defendant while Officer Lockhart again approached the vehicle to speak with the Defendant.

Officer Lockhart asked the Defendant for his ID, and the Defendant gave Officer Lockhart a passport and explained that he did not have a driver's license. The name on the passport was "Dane M. Sayles." Upon further investigation into the passport, Officer Lockhart learned that the Defendant's name was Bradley Melvin Sayles. The passport contained a Pennsylvania address, but the Defendant told Officer Lockhart that he lived in Atlanta. The Defendant explained that they were traveling to Pittsburgh. When Officer Lockhart asked, however, if anyone was sick, the Defendant responded, "[N]o, nobody's sick. We're just going to visit." At this point, Officer Lockhart developed a suspicion of criminal activity.

Officer Lockhart then returned to the co-defendant and informed him that there were discrepancies in the co-defendants' stories. He asked the co-defendant whether they had

anything illegal in the vehicle, listing specific items. The co-defendant denied having anything illegal in the vehicle, but, when asked specifically about cocaine, he turned and looked at the vehicle. Officer Lockhart requested permission to search the vehicle, and the co-defendant declined. The co-defendant continued to exhibit a "nervous energy," which gave Officer Lockhart the indication that "something was not right."

Officer Lockhart returned to his vehicle and called to request a K-9 unit. He then walked back toward the co-defendant and notified him that the K-9 unit was on its way. At that point, the co-defendant stated that he wanted Officer Lockhart to search the vehicle rather than use the K-9 unit. Accordingly, Officer Lockhart called and cancelled the request for the K-9 unit. He asked the Defendant to step out of the vehicle and to join the co-defendant while he searched the vehicle. As Officer Lockhart initially looked into the vehicle, he noticed that the seatbelts in the back seat were stuffed between the seat cushions, which seemed to be "an indicator," given that the vehicle appeared relatively new. After looking through the front of the vehicle, he lifted up the backseat and found "the first kilo of cocaine."

At this point, Officer Lockhart pulled out his taser, returned to the co-defendants, and placed both of them in handcuffs. He could not remember whether he informed them at that time as to why he was placing them in custody. Officer Lockhart placed the co-defendant in his patrol vehicle and left the Defendant near the front of the vehicle while he returned to the rental vehicle to again look beneath the back seat. This time, he found "another kilo of cocaine . . . on the other side under the back seat."

Officer Lockhart placed the "two kilos" of cocaine on the back of the rental vehicle and placed the Defendant in the back of his patrol vehicle with the co-defendant. At that time, Officer Lockhart also found $1,927 in cash in the possession of the Defendant.

Officer Lockhart testified that the rental vehicle was towed to the narcotics office of the department. He identified a picture of a text message displayed on the confiscated Blackberry which read, "I'm about to go out of town real quick. I'll be back tomorrow. My mom going to pick up or pick you up. Her number." He also identified other text messages that read, "[W]ould you tell me if you were going to make a run" and "We're going to work." From the Nokia cell phone, Officer Lockhart identified a picture of a text message that read, "They want to search the car." Officer Lockhart asked both co-defendants if they were working, and both individuals stated that they did not have a job at that time.

Officer Lockhart next identified business cards that he found inside a small phone book found at the scene. The State played the video from Officer Lockhart's patrol vehicle for the jury. On cross-examination, Officer Lockhart agreed that he had watched the video

approximately three or four times and had watched the video before writing his report. He also acknowledged that the video did not depict the vehicle's improper lane change or failure to use its blinker.

Officer Lockhart also acknowledged that, shortly after informing the co-defendant that he had requested a K-9 unit, he turned off his microphone for five minutes. He and the co-defendant also were out of the view of the camera during that time. Five minutes later, the video depicted Officer Lockhart again ask the co-defendant, "Now, I can search, right," to which the co-defendant consented. Additionally, although Officer Lockhart previously had testified that he did not observe any items in the back seat of the vehicle, he acknowledged a photograph from the scene depicting either a black bag or jacket in the back seat.

Craig Johnson, a supervisory sergeant over the property and evidence room for the CPD, testified regarding the procedure for intake of evidence. He identified an intake form of the items submitted in this case, including two kilos of cocaine, $1,927 in cash, a Blackberry cell phone, a Nokia cell phone, a passport, and a small brown phone book.

Special Agent Cassandra Beavers, a forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory in Nashville, testified as an expert in the specialization of controlled substance identification. She confirmed that the bag of a controlled substance examined in this case tested positive for cocaine.

Sergeant Jason Lewis of the CPD testified that he was assigned as a supervisor over the special investigations division. On April 28, 2008, he received a call from Officer Lockhart to join Officer Lockhart at the scene on Interstate 75. By the time that Sergeant Lewis had arrived at the scene, Officer Lockhart had found the cocaine, and Sergeant Lewis believed the cocaine already was outside of the vehicle. He could not remember whether he or Officer Lockhart took the photographs at the scene.

Sergeant Lewis identified the Blackberry cell phone as belonging to the co-defendant and the Nokia cell phone as belonging to the Defendant. He agreed that he searched both phones for text messages and took pictures of text messages retrieved from both phones. He confirmed that he was the officer who sent the controlled substance to the crime laboratory. He also was the person who downloaded the video from Officer Lockhart's camera to a disc in its original form before it was enhanced.

Sergeant Lewis estimated that one gram of cocaine is worth $100 "on the street." Thus, because two kilograms is two thousand grams, two kilograms would be worth approximately $200,000. He stated that on May 6, 2008, he and Officer Lockhart removed the packaging from the cocaine to have the packaging processed for fingerprints.

-10-

When asked why Officer Lockhart left the CPD, Sergeant Lewis testified that Officer Lockhart's stated reason to him was that a policy was changing that would not allow Officer Lockhart to take his patrol vehicle home.

Investigator Gregory Mardis with the CPD testified as an expert in the field of fingerprint analysis. He received a request to analyze packaging material for fingerprints. However, he only was able to find "smudges" and no identifiable fingerprints.

Gerald W. Smith, the corporate security manager for the Hertz Corporation in Atlanta, Georgia, testified regarding the process for vehicle rentals and returns. He stated that, upon the return of rental vehicle, "[t]he car is then cleaned, refueled and vacuumed and washed." Although it would depend on the type of vehicle, he stated that the rear seat usually would not be lifted up. He also explained the process for designating multiple authorized users for a rental vehicle as follows: "They would need a credit card and driver's license just like renting the vehicle themself. And there would be an additional operator form that would be filled out and it would accompany the rental agreement." The rental agreement itself would not list the additional authorized users, but the agreement would list an extra charge associated with that additional driver.

Smith identified a rental agreement between Hertz and the individual who rented the rental vehicle prior to Campbell in this case. According to documentation, the vehicle was returned to Hertz by this individual, Catherine Love, on April 28, 2008, the same day it was rented by Campbell. The contract specified that Love rented the vehicle through her insurance, likely providing transportation while her primary vehicle received repairs. Campbell rented the vehicle approximately forty-five minutes after Love returned it to the company. Hertz documented that the vehicle had 1,750 miles at the time it was returned and 1,760 miles at the time that Campbell received the vehicle.

Smith stated that, although it is common for individuals to leave behind items such as sunglasses and cameras in a rental vehicle, it is very uncommon for someone to leave behind illegal drugs. In his twenty-one years of experience at Hertz, he could not remember a situation in which illegal drugs were found upon the return of a rental vehicle.

Officer Jamie Hixson, a Drug Enforcement Administration task force officer with the CPD, testified as an expert in the field of narcotics investigation. He stated that "[c]ocaine is manufactured from a coca bush in South America. And the whole purpose of the manufacturing or the refining of the coca leaf is to create cocaine hydrochloride or cocaine powder." He agreed that, because he only knew the coca leaf to grow in South America, any cocaine in the United States would have been transported here. Typically, the newly

manufactured cocaine is compressed into a kilogram or "brick" of cocaine and transported in that form to the United States. He further explained,

> Atlanta has become a major distribution hub for criminal organizations trafficking in cocaine. Atlanta has become what Miami was back in the early '80s. . . . That has now shifted from Miami to Atlanta because of the interstate systems and because of the way the population of Atlanta has become.

Officer Hixson stated that someone buying a personal amount of cocaine would purchase one gram or less.

At the conclusion of the trial, the jury found the Defendant and co-defendant guilty of possession of 300 grams or more of cocaine for resale. The jury also found the co-defendant guilty of speeding but acquitted him for failure to maintain his lane of travel.

At the sentencing hearing, the Defendant and State agreed that the Defendant would be sentenced as a Range II offender. The State called James H. Rox, Jr., who is employed with the State Board of Probation and Parole, as a witness. He testified that he prepared a pre-sentence investigation report regarding the Defendant. Rox learned that the Defendant had a total of nine prior felony convictions, consisting of four prior felony drug convictions, one armed robbery conviction, and four other convictions for "burglary and property crimes." The Defendant also had one prior misdemeanor conviction.

At the time of the offense related to this case, the Defendant was on parole and had outstanding warrants in the Allegheny Court of Common Pleas for "[c]riminal use of communication facility, criminal conspiracy, . . . possession with intent to manufacture or deliver, and a corrupt organizations." Rox confirmed that, at the time of this offense, the Defendant was employed on a contract basis with Stat Courier in Pennsylvania. However, the Defendant was using the name of his brother, Dane Sayles, in his employment.

Regarding the Defendant's health, the Defendant told Rox that within the past nine years he had developed "diabetes, high blood pressure, high cholesterol, [and] arthritis" but that he controlled these conditions with medication. On cross-examination, Rox denied speaking with the Defendant's probation officer in Pennsylvania. He was unable to speak with any of the Defendant's family.

At the conclusion of the proof at the sentencing hearing, the State agreed that the Defendant's armed robbery conviction had been nolle prossed. The trial court found applicable the first statutory enhancement factor, the Defendant's "previous history of criminal convictions or criminal behavior." Tenn. Code Ann. § 40-35-114(1) (Supp. 2007).

The trial court also found that, based on "how they obtained the car, the age of the [D]efendant in relationship to his younger co-defendant, [and] statements that were made in the back seat of the police officer's car," the Defendant "was the leader in the commission of this offense involving two or more criminal actors." See id. § -114(2). Additionally, the trial court found that the Defendant committed the felony while he was on parole. See id. § -114(13)(B).

As for mitigating factors, the trial court found that the Defendant's "criminal conduct neither caused nor threatened serious bodily injury." See Tenn. Code Ann. § 40-35-113(13) (2006). The trial court also considered the fact that the Defendant was employed when he was not incarcerated, "which was not really very often," and that, while incarcerated, the Defendant "initiated numerous educational, spiritual and developmental courses, which he completed and still remains in attendance." Finally, the trial court found that the Defendant was "of elder age and has been suffering with serious medical issues." Accordingly, the trial court sentenced the Defendant to serve forty years' incarceration. Because the trial court found that the Defendant "is a professional criminal who has knowingly devoted his life to criminal acts as a major source of his livelihood," the trial court denied any type of probation or release. The trial court also ordered that this sentence run consecutively to the Defendant's sentences for his convictions in Pennsylvania.

The Defendant subsequently filed a motion for new trial, challenging the sufficiency of the evidence and sentencing. The Defendant also contended that the trial court erred in: failing to suppress the stop and search of the vehicle; "failing to suppress retrieval of private cell phone texts"; "depriving the Defendant [of] the opportunity to cross-examine the witness regarding profiling"; and "allowing the State to continue adding witnesses in the middle of trial whose names were not provided in discovery." Finally, the Defendant argued that "[t]he State submitted an improper closing argument." The trial court denied the motion, and the Defendant timely appealed. On appeal, the Defendant argues that the trial court erred in denying his motion to suppress the stop and search of his vehicle, as well as the seizure of cell phone text messages. The Defendant also asserts that the trial court erred in "permitting the State to continue adding witnesses in the middle of trial whose names were not provided in discovery." Finally, the Defendant challenges the length of his sentence.

**Analysis**

*Motion to Suppress*

When conducting a review of the trial court's determinations from a suppression hearing, we may consider the evidence adduced at the suppression hearing as well as evidence introduced at trial in determining whether the trial court properly denied the motion

-13-

to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). Questions regarding the witnesses' credibility, "the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, we will uphold the trial court's factual findings unless the preponderance of the evidence is otherwise. Id. However, where the trial court has applied the law to the facts, we will conduct a *de novo* review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Because the State is the prevailing party, it is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. State v. Ingram, 331 S.W.3d 746, 754 (Tenn. 2011) (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)).[4] Accordingly, "under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (quoting State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

An exception to the warrant requirement within the context of seizures occurs "when a police officer makes an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." Id. (citing Terry v. Ohio, 392 U.S. 1, 20-21 (1968); State v. Bridges, 963 S.W.2d 487, 492 (Tenn. 1997)). The Tennessee Supreme Court defines reasonable suspicion as "'a particularized and objective basis for suspecting the subject of a stop of criminal activity.'" State v. Day, 263 S.W.3d 891, 903 (Tenn. 2008) (quoting Binette, 33 S.W.3d at 218). This Court shall consider "the totality of the circumstances surrounding the stop" in assessing whether the officer had the requisite reasonable suspicion necessary to justify the stop. Binette, 33 S.W.3d at 218 (citing Alabama v. White, 496 U.S. 325, 330 (1990)).

---

[4] The Fourth Amendment is applicable to the States through the Fourteenth Amendment to the United States Constitution. See Mapp, 367 U.S. at 655; Ingram, 331 S.W.3d at 754. The intent and purpose of article I, section 7 of the Tennessee Constitution is identical with the Fourth Amendment; however, our Supreme Court has noted previously that Tennessee's search and seizure case law has developed independently from, and extends greater protection than, federal law. See State v. Richards, 286 S.W.3d 873, 877-78 (Tenn. 2009).

The Defendant first contends that the trial court erred in denying his motion to suppress the items found as a result of the stop and search of the rental vehicle. The State responds that Officer Lockhart had probable cause to stop the co-defendants for speeding, that he acquired the necessary reasonable suspicion to prolong the stop, and that he obtained valid consent to search the vehicle. We agree with the State.

## The Stop

We first assess whether Officer Lockhart properly stopped the vehicle in which the co-defendants were traveling. An officer may decide to stop a vehicle if that officer has "probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). Additionally, an officer is permitted to make an investigatory stop of a vehicle as long as that officer has "a reasonable suspicion, supported by specific and articulable facts, that the occupants of the vehicle have committed, are committing, or are about to commit a criminal offense." State v. England, 19 S.W.3d 762, 766 (Tenn. 2000) (citing United States v. Cortez, 449 U.S. 411, 417 (1981)) (other citations omitted).

The trial court credited Officer Lockhart's testimony that the co-defendant was driving over ten miles per hour above the posted speed limit. Thus, we hold that Officer Lockhart had probable cause to stop the vehicle due to the speeding violation.

## Continued Detainment

Next, we assess whether Officer Lockhart was justified in prolonging the duration of the stop. In looking at the length of the detention, we first recognize that, "[r]equests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Harris, 280 S.W.3d 832, 840 (Tenn. Crim. App. 2008). However, "a law enforcement officer making a valid traffic stop must not prolong the stop for longer than necessary to process the traffic violation without having some reasonable suspicion of other criminal activity sufficient to warrant prolonging the stop." Id. at 842 (citing State v. Walker, 12 S.W.3d 460, 464 (Tenn. 2000)).

Reasonable suspicion has become known as a "common sense standard that permits an officer" to detain a suspect within the context of an investigatory stop "when he or she reasonably suspects that a specific person has engaged in, is engaging in, or is about to engage in criminal activity." Day, 263 S.W.3d at 908. It requires "more than an 'inchoate and unparticularized suspicion or hunch.'" Id. at 907 (quoting Terry, 392 U.S. at 27). Courts must look to the totality of the circumstances when determining whether reasonable suspicion existed in the particular case. Id. The State bears the burden of providing facts sufficient to

-15-

establish reasonable suspicion. Id. at 908. "[I]nconsistencies in information given to an officer during a traffic stop may give rise to reasonable suspicion of criminal activity." State v. Garcia, 123 S.W.3d 335, 350 (Tenn. 2003) (quoting United States v. Smith, 263 F.3d 571, 592 (6th Cir. 2001)). Additionally, "nervous, evasive behavior is also a pertinent factor in determining reasonable suspicion." Nicholson, 188 S.W.3d at 661 (citing Illinois v. Wardlow, 528 U.S. 119, 124 (2000)).

The Defendant contends that Officer Lockhart's trial testimony was inconsistent with his testimony at the suppression hearing. However, the record also includes the video of the stop, including those conversations between Officer Lockhart and the co-defendant and Officer Lockhart and the Defendant. At the suppression hearing and at trial, Officer Lockhart testified that, upon first approaching the rental vehicle, he noticed that both of the co-defendants appeared nervous. When Officer Lockhart asked the co-defendant for his driver's license and insurance, the co-defendant handed Officer Lockhart his entire wallet. According to Officer Lockhart, the Defendant was breathing heavily, and "the carotid artery in his neck was beating rapidly."

After running a "computer check" of the co-defendant's driver's license, he asked the co-defendant to step out of the rental vehicle. As he wrote a warning citation, he asked the co-defendant about his travel plans. The co-defendant stated that they were traveling from Atlanta to Pennsylvania because "his sister was having a kidney transplant." Although the co-defendant stated that his sister was in the hospital, he could not recall the name of the hospital.

At some point, the co-defendant informed Officer Lockhart that the vehicle he was driving was a rental vehicle. Officer Lockhart examined the rental agreement and noticed that the person to whom the vehicle was registered was not present and that no one else had express permission to drive the vehicle. The co-defendant informed Officer Lockhart that the registrant was the Defendant's girlfriend. He identified the Defendant as his uncle, but the co-defendant could not tell Officer Lockhart his name. On the video, the co-defendant identified the Defendant as his "uncle Dane," but when asked his last name, stated, "Would you like me to go ask him?"

Officer Lockhart then approached the Defendant, asked for his ID, and questioned him regarding their travel plans. The Defendant gave Officer Lockhart his passport and stated that they were going to Pennsylvania to visit family. Officer Lockhart asked the Defendant if someone was sick or if it was just a vacation, to which the Defendant responded, "[N]o, everything's fine, we're just going to see family."

Looking to the totality of the circumstances, including the nervousness of the co-defendants and the inconsistencies in their stories, we find that Officer Lockhart had sufficient reasonable suspicion to prolong the stop. Accordingly, the detention of the co-defendants was proper under the United States and Tennessee constitutions.

## Consent to Search

Finally, we assess whether Officer Lockhart obtained valid consent to search the rental vehicle. The Tennessee Supreme Court has stated that it is a "fundamental principle under our state and federal constitutions that a warrantless search is presumed invalid and any evidence discovered as a result is subject to suppression." Ingram, 331 S.W.3d at 754 (citing Day, 263 S.W.3d at 901; State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). Thus, when a search or seizure is determined to be illegal, the evidence obtained in that search or seizure is excluded from use by the prosecution. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); State v. Huddleston, 924 S.W.2d 666, 674 (Tenn. 1996). This exclusionary rule "was designed to protect Fourth Amendment guarantees by deterring lawless searches, seizures, and arrests." Huddleston, 924 S.W.2d at 674.

There are several recognized exceptions to the rule against warrantless searches. Ingram, 331 S.W.3d at 755. Because a trial court must presume "that a warrantless search or seizure is unreasonable," it is the State's burden to establish "that one of the exceptions to the warrant requirement applied at the time of the search or seizure." Samuel L. Giddens v. State, No. M2006-01938-CCA-R3-PC, 2008 WL 271967, at *3 (Tenn. Crim. App. Jan. 29, 2008) (citing Yeargan, 958 S.W.2d at 629). The most common of these exceptions include: (1) a stop and frisk situation; (2) a search incident to a lawful arrest; (3) consent to search; (4) probable cause to search with exigent circumstances; (5) hot pursuit; and (6) plain view. Day, 263 S.W.3d at 901 n.9 (citations omitted). Courts are admonished to keep these recognized exceptions to the warrant rule "'well-delineated,' 'jealously and carefully drawn,' and 'narrowly' defined." Ingram, 331 S.W.3d at 755 (citations omitted).

In order for a consensual search to be constitutional, "it must be 'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Cox, 171 S.W.3d 174, 184 (Tenn. 2005) (quoting State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998)). "'[T]he existence of consent and whether it was voluntarily given are questions of fact' which require examining the totality of the circumstances." Id. at 184-85 (quoting State v. Ashworth, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999)). Courts look at several factors to determine voluntariness, including:

> (1) Time and place of the encounter; (2) Whether the encounter was in a public
> or secluded place; (3) The number of officers present; (4) The degree of

hostility; (5) Whether weapons were displayed; (6) Whether consent was requested; and (7) Whether the consenter initiated contact with the police.

Id. at 185.

The trial court found that the Defendant and co-defendant were not the de facto renters of the vehicle, so they did not possess an expectation of privacy in the vehicle. However, we need not determine whether the co-defendants had an expectation of privacy in the rental vehicle because we conclude that the co-defendant gave valid consent to the search of the vehicle.

Officer Lockhart testified, both at the suppression hearing and at trial, that he asked the co-defendant for consent to search the vehicle. The co-defendant denied consent at that time, so Officer Lockhart returned to his patrol vehicle to request a K-9 unit. Upon making the request, he returned to inform the co-defendant, who was standing between the two vehicles, that a K-9 unit was on the way. At that point, the co-defendant told Officer Lockhart that Officer Lockhart could search the vehicle. Thus, we hold that the co-defendant voluntarily consented to the search of the rental vehicle. Therefore, even if the co-defendant had an expectation of privacy in the vehicle and its contents, the search was lawful under the consent exception.

Based on the analysis above, the trial court appropriately denied the Defendant's motion to suppress the evidence found as a result of the stop and subsequent search of the rental vehicle. Accordingly, the Defendant is entitled to no relief on this issue.

*Motion in Limine*

The Defendant also argues that the trial court erred in allowing the admission of cell phone text messages at trial. He contends that a cell phone deserves greater protection than other "containers" found on a person's body in a search incident to arrest. The State disagrees.

As discussed above, a search incident to arrest is one of the valid exceptions to the warrant requirement. See Day, 263 S.W.3d at 901 n.9; State v. Watkins, 827 S.W.2d 293, 295 (Tenn. 1992). "When police officers make a lawful custodial arrest, they are permitted, as incident to the arrest, to search the person arrested and the immediately surrounding area." State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999) (citation omitted). The purpose for a search incident to arrest is two-fold: first, "to disarm the arrestee in order to safely take him into custody; and second, "to preserve evidence for later use at trial." Id. (citing United States v. Robinson, 414 U.S. 218, 234 (1973)).

Here, the Defendant does not challenge the legality of the arrest but rather the scope of the search. The Defendant contends that searching the contents of a cell phone extends beyond a permissible search incident to arrest.

Notably, "[t]he permissible scope of a search incident to a lawful arrest extends to containers found on the arrestee's person." United States v. Finley, 477 F.3d 250, 260 (5th Cir. 2007) (citations omitted). In Finley, the Fifth Circuit held that searching the contents of the defendant's cell phone, including call records and text messages, was proper within the scope of a search incident to arrest. Id. Furthermore, the court observed in a footnote,

> The fact that the search took place after the police transported Finley to Brown's residence does not alter our conclusion. Cf. United States v. Edwards, 415 U.S. 800, 803 (1974) ("[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention."). In general, as long as the administrative processes incident to the arrest and custody have not been completed, a search of effects seized from the defendant's person is still incident to the defendant's arrest. United States v. Ruigomez, 702 F.2d 61, 66 (5th Cir. 1983) (citing Edwards, 415 U.S. at 804). . . .
>
> Likewise, United States v. Chadwick, 433 U.S. 1 (1977) is inapplicable. Chadwick held that,
>
> > [o]nce law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.
>
> 433 U.S. at 15 (emphasis added). Finley's cell phone does not fit into the category of "property not immediately associated with [his] person" because it was on his person at the time of his arrest.

Id. n. 7. The Fourth and Seventh Circuits also have upheld the seizure of the contents of a cell phone or pager in the context of a search incident to arrest. See United States v. Murphy, 552 F.3d 405, 409 (4th Cir. 2009); United States v. Ortiz, 84 F.3d 977, 984 (7th Cir. 1996).

The Defendant does not contend that the cell phones were not found on the persons of the co-defendants. However, it is unclear from the record whether the two cell phones

were found on the persons of the co-defendants or in the vehicle. As discussed above, if both cell phones were found on the persons of the co-defendants, the searches of the cell phones' contents were proper as a valid search incident to arrest. If, however, one or both cell phones were not found on the person but rather in the rental vehicle, we already have determined above that the co-defendant gave valid consent to the search of the vehicle. Federal courts have upheld the search of a cell phone or pager by officers given consent to search the vehicle where the cell phone was found. See United States v. Reyes, 922 F. Supp. 818, 834 (S.D.N.Y. 1996); United States v. Stapleton, 10 F.3d 582, 584 (8th Cir. 1993) (defendant impliedly consented to search of cell phone when driver consented to search of vehicle and defendant did not object).

Moreover, we note that the cell phones first were searched by the officers at the scene, at which point the officers took photographs of particular text messages. Then, later, Mark Hamilton with the CPD retrieved data from the cell phones and placed all the data onto compact discs. Hamilton testified at trial regarding his process for obtaining the data and times that certain text messages were retrieved. However, he did not testify regarding the content of these text messages, and the compact discs containing the cell phone data never were entered into evidence. Rather, the discs were marked for identification purposes only.

Officer Lockhart later testified regarding the content of certain text messages he found on the two cell phones. He also identified photographs of certain text messages he took on the night of the stop. The State then entered these photographs into evidence.

Thus, to the extent the Defendant argues that Hamilton's testimony regarding the timing of the text messages is improper, such testimony, even if improper, would be harmless, given that the photographs and the content of the text messages were entered properly into evidence through Officer Lockhart. See State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). Therefore, we hold that the trial court's admission of the contents of these cell phones was proper. Accordingly, the Defendant is entitled to no relief on this issue.

*Additional State Witnesses*

The Defendant argues that the trial court erred in "permitting the State to continue adding witnesses in the middle of trial whose names were not provided in discovery." Although the Defendant does not name specifically any of these allegedly added witnesses on appeal, we will address those witnesses challenged in his motion in limine.

The State must include in the indictment "the names of the witnesses as [it] intends shall be summoned in the cause." Tenn. Code Ann. § 40-17-106 (2006). However, the statute "is directory only and does not necessarily disqualify a witness whose name does not

-20-

appear on the indictment from testifying." State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992) (citing State v. Street, 768 S.W.2d 703, 710-11 (Tenn. Crim. App. 1988)). Rather, the purpose of the statute is to furnish the names of potential witnesses in order to prevent surprise for the defense at trial. See State v. Melson, 638 S.W.2d 342, 364 (Tenn. 1982). In order to obtain relief, a defendant must show "prejudice, bad faith, or undue advantage" as a result of the State's delay in furnishing the witnesses' names. Harris, 839 S.W.2d at 69 (citing State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987); State v. Craft, 743 S.W.2d 203 (Tenn. Crim. App. 1987)). "Moreover, prejudice to the defendant must result from the lack of notice [and] not the prejudice which resulted from the witness's testimony." State v. Billy Joe Carter, No. E2005-01282-CCA-R3-CD, 2007 WL 1515010, at *12 (Tenn. Crim. App. May 24, 2007) (citations omitted). Additionally, Rule 16 of the Tennessee Rules of Criminal Procedure "does not authorize pretrial discovery of the names and addresses of State's witnesses." State v. Martin, 634 S.W.2d 639, 643 (Tenn. Crim. App. 1982).

Prior to trial, the Defendant challenged the State's addition of the following witnesses: Mark Hamilton, Jamie Hixson, Gerald Smith, and Craig Johnson. The trial court heard lengthy discussion from defense counsel and the State regarding these witnesses' purported testimony. Ultimately, the trial court allowed all of these witnesses to testify, with the caveat that defense counsel must be allowed an opportunity to speak with them prior to their testimony. Although the State initially failed to include the names of these witnesses in the indictment as potential witnesses, the Defendant has failed to show "prejudice, bad faith, or undue advantage." Harris, 839 S.W.2d at 69. Thus, without such a showing by the Defendant, the trial court did not abuse its discretion in allowing the State to call these witnesses to testify at trial.

*Sentencing*

The Defendant has challenged his sentence, contending that it is excessive. Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (Supp. 2007). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2006).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2006).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our

Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

We now turn to the Defendant's claim on appeal that the length of his sentence is improper.[5] In this case, the Defendant was convicted of possession with intent to sell or deliver three hundred grams or more of cocaine, a Class A felony,[6] which carries a sentence of twenty-five to forty years for a Range II offender. See Tenn. Code Ann. § 40-35-112(b)(1) (2006). The trial court's sentence of forty years, therefore, is within the authorized term for a Class A felony.

The trial court determined that the following enhancement factors were established by the proof submitted at the sentencing hearing: the Defendant has "a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; and "[a]t the time the felony was committed, one (1) of the following classifications was applicable to the defendant: . . . (B) Released on parole." See Tenn. Code Ann. § 40-35-114(1), (2), (13)(B).

Regarding the first factor, the presentence report indicates that the Defendant had four prior felony drug convictions and four prior convictions for burglary and property-related crimes. Additionally, the Defendant had one prior misdemeanor drug conviction. Therefore, the Defendant clearly had additional convictions beyond those necessary to establish him as a Range II offender. See Tenn. Code Ann. § 40-35-106 (2006). Thus, the trial court's application of this factor was proper. See id. § 40-35-114(1).

_____

[5] The Defendant does not challenge the consecutive service of his sentence, so we will not address it in our analysis.

[6] See Tenn. Code Ann. § 39-17-417(j)(5) (Supp. 2007).

Next, we look at the factor that assesses whether "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors." The trial court based its application of this factor on "how [the co-defendants] obtained the car, the age of the [D]efendant in relationship to his younger co-defendant, [and] statements that were made in the back seat of the police officer's car." The trial court's findings are supported by the record. Testimony established at trial that the co-defendants obtained the rental vehicle through the Defendant's girlfriend, Campbell. On the video played to the jury, the co-defendant told the Defendant in the back of the patrol vehicle, "This is a new experience." The Defendant responded to him, "I know it is, partner. I don't – I hate to see you going through it. I don't even want you going through it." The co-defendant told Officer Lockhart that the Defendant was his uncle. Therefore, the record supports the trial court's application of this factor. See Tenn. Code Ann. § 40-35-114(2).

Finally, we look to the last enhancement factor applied by the trial court: that the Defendant was on parole at the time that he committed the underlying offense. Rox testified at the sentencing hearing that, at the time of the underlying offense, the Defendant was on parole and also had outstanding warrants in the Allegheny Court of Common Pleas for "[c]riminal use of communication facility, criminal conspiracy, . . . possession with intent to manufacture or deliver, and a corrupt organizations." Thus, the application of this factor also is supported by the record. See Tenn. Code Ann. § 40-35-114(13)(B).

The trial court also determined that the following mitigating factors were established by the proof submitted at the sentencing hearing: "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury"; the fact that the Defendant was employed when he was not incarcerated; that, while incarcerated, the Defendant "initiated numerous educational, spiritual and developmental courses, which he completed and still remains in attendance"; and that the Defendant was "of elder age and has been suffering with serious medical issues." See Tenn. Code Ann. § 40-35-113(1), (13) (the trial court may consider, as a mitigating factor, "[a]ny other factor consistent with the purposes of this chapter").

These mitigating factors are supported by the record. No testimony was established at trial about anyone suffering bodily harm or even the threat of bodily harm. Rox testified at the sentencing hearing that the Defendant, at the time of the underlying offense, was employed on a contract basis with Stat Courier in Pennsylvania. Finally, when preparing the presentence report, the Defendant informed Rox that over the past nine years he had developed "diabetes, high blood pressure, high cholesterol, [and] arthritis" but that he controlled these conditions with medication.

A trial court's weighing of enhancement and mitigating factors is "left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. The trial court, in weighing all of the

enhancement and mitigating factors, sentenced the Defendant to forty years, while also noting and applying the principles of sentencing.  See Tenn. Code Ann. § 40-35-102(1), (3)(C).  We hold that the trial court imposed this sentence in a manner consistent with the purposes, principles, and goals of the Sentencing Act.  Thus, we discern no abuse of discretion by the trial court, and the Defendant is entitled to no relief.

## CONCLUSION

For the reasons set forth above, we affirm the judgment of the trial court.


_____
JEFFREY S. BIVINS, JUDGE